A91A1533. HENDON v. DeKALB COUNTY et al.
A91A1534. PIRKLE v. HENDON.
(417 SE2d 705)

BEASLEY, Judge.

Hendon instituted this suit against DeKalb County and various of its officers and employees, based upon their response to a "911" emergency telephone call placed by him. The trial court held that the defense of sovereign immunity bars suit against the county and its officers in their official capacities, but that the police officer who had been dispatched to Hendon's residence could be sued in his individual capacity. Hendon appeals. The police officer, Pirkle, cross-appeals.

*Summary of evidence related to issues on appeal*

After suffering the onset of a stroke in the early morning hours of July 6, 1986, Hendon placed two "911" calls to DeKalb County's emergency telephone system, which is operated by the Communications Division of the DeKalb County Department of Public Safety. The second call, which is the only one in issue, began at 5:08 p.m. and ended at 6:04 p.m., was answered by switchboard operator Jackson.

She testified that the caller was breathing heavily and unable to speak; she repeatedly asked him to state his name, address, and telephone number, and whether he needed an ambulance or police assistance, but his responses were incoherent and inaudible. At one point, Jackson told the caller that if he was playing on the phone, the police would come and take him to jail. She testified that she said this because she could only hear him breathing deeply, and they get a lot of crank calls from children who do that.

Hendon argues that during this telephone conversation, his respiratory pattern was labored, and although he was unable to speak clearly, on repeated occasions he made affirmative responses to questions as to whether he needed an ambulance; he repeatedly voiced the words "Help" and "Help me"; and he moaned and voiced other discernible expressions of physical pain.

The "911" telephone conversation was recorded on a reel-to-reel tape being played on a Dictaphone 5500 machine used by the county in operating its "911" system. From this tape, plaintiff made three audio tape recordings, which were admitted in evidence, as well as a videotape. One of these audio tapes technologically enhanced the sound quality of the conversation by deleting static and background noise. The videotape was not admitted in evidence. Jackson testified that although she could hear the caller uttering the words "Help" or "Help me" on the videotape, she could not hear these words during the telephone conversation.

Shortly after the telephone conversation began, Jackson requested assistance from her supervisor Blackwell, who began to monitor the conversation and question the caller. At Blackwell's request, a Southern Bell operator traced the call. Blackwell told the operator that the caller was unable to breath and in distress.

The procedure adopted is as follows. "911" switchboard operators ascertain the location of a call and determine whether the caller is requesting assistance from one of three response units: the police, firemen, or emergency medical service (EMS). Once that determination is made, the operator relays the information by computer to a radio dispatcher, who transmits the information through signals to the appropriate response unit in the geographical area in which the caller is located. The signal determines the priority of the call and the requested response unit. The switchboard operators and radio dispatchers relay whatever information is given them. If the requested response is unclear, the police are generally dispatched because they have the shortest response time. Discretion in determining the assistance which should in fact be provided is exercised by the response units on the scene.

Blackwell forwarded Hendon's call to the radio dispatcher as a Signal 13, which is a "check location" low-priority non-emergency dis-

patch directed to the police department. The proper response to a situation involving a person in respiratory distress is a Signal 02L, which is a high-priority "person down, life-threatening" medical emergency. This brings in an ambulance and emergency medical technicians. At the time of the dispatch, Jackson entered the following comments into the computer system: "Caller . . . cannot give address/poss needs help/operator traced call to this address . . . phone number comes back to Mr. E. T. Herndo [sic]."

The radio dispatcher, Fitzpatrick, testified that in a radio communication to Sergeant Pirkle, she stated that the caller was "possibly having respiratory distress," and she made this statement because Blackwell had repeatedly so advised. Blackwell denied telling Fitzpatrick that the caller was possibly having respiratory distress, and she testified that she would have sent an ambulance if she was aware that this was the problem.

The initial radio dispatch was received by Officer C. E. Hall, who was the first officer to arrive on the scene. He recognized the name Hendon to be that of a lawyer or judge. Sergeant Pirkle, who next arrived, knew Hendon was a former superior court judge. Pirkle testified that Hendon had a reputation for heavy drinking, and in a radio communication from him to Fitzpatrick he stated that Hendon sounded drunk. Hall checked all windows and doors in an attempt to gain entry into the house. He advised Pirkle that he could break the glass in the back door and easily gain entry. Pirkle knocked on the back door and requested Fitzpatrick to inform the caller that Pirkle was at the door and wanted to be let in. In response, Fitzpatrick erroneously stated that Hendon "refused" to come to the door. She was later given a reprimand as a result, in that "refused" means unwilling, which significantly differs from "unable." At 6:02 p.m., Pirkle made a radio dispatch stating, "We're going to be 10-8 [in service]. I assume he's 10-4 [ok]."

The following day, at approximately 5:00 p.m., Hendon's son returned home from out of town and found his father lying next to his bed and wearing a pajama top. He called "911" and an ambulance was sent. There was expert testimony that the delay in the receipt of medical care and treatment significantly contributed to Hendon's permanent neurological damage.

### Procedural history

Hendon filed this complaint against: DeKalb County; F. D. Hand, Jr., individually and in his official capacity as the Director of the DeKalb County Department of Public Safety; Leroy Pirkle, individually and in his official capacity as DeKalb County Police Sergeant; and "Jane Doe" and "John Roe," unidentified persons in their indi-

vidual and official capacities as DeKalb County "911" emergency telephone system switchboard operators, police dispatchers, police officers, and employees or officials with responsibility for implementing the "911" system and supervising or training its personnel.

Plaintiff seeks recovery against the defendants under state tort law and 42 USC § 1983. He alleges that "[d]efendants' acts or omissions to act, as set forth in this Complaint, constituted gross negligence, conscious and deliberate indifference to the consequences, conscious and reckless disregard for the consequences, callous and arbitrary misuse and abuse of governmental power and authority, intentional wanton and willful misconduct, and/or bad faith."

After discovering the identities of the unknown defendants, Hendon sought to amend his complaint to add as party defendants Blackwell, Fitzpatrick, Hall, and Jackson, Brooks (another "911" switchboard operator), and Noles (Manager of the Communications Division of the Department of Public Safety). For insufficient service and for expiration of the statute of limitation, the trial court denied Hendon leave to so amend.

The court granted defendants' motion to dismiss those parts of plaintiff's complaint based on 42 USC § 1983. As to plaintiff's state tort claims, the court held that under the state statutory scheme governing "911" emergency telephone systems, sovereign immunity bars suit against the county, but that county employees are personally liable for wilful misconduct, gross negligence, or bad faith.

The court initially denied the county's motion for summary judgment based on the fact that in 1985 the county established a self-insurance fund which operates as a waiver of sovereign immunity under the Georgia Constitution, Art. I, Sec. II, Par. IX, as held in *Martin v. Ga. Dept. of Public Safety*, 257 Ga. 300, 301 (357 SE2d 569) (1987). Following the decision of the Georgia Supreme Court in *Logue v. Wright*, 260 Ga. 206 (392 SE2d 235) (1990), the court reversed the ruling and held that DeKalb County had not waived its defense of sovereign immunity. Summary judgment was entered in favor of the county, as well as Hand and Pirkle in their official capacities.

However, the court ruled that as to claims filed against Pirkle in his individual capacity, he was not entitled to summary judgment, because allegations that he acted outside his official capacity by acting maliciously, wantonly, and recklessly are based on disputed facts which must be determined by a jury. Because of the absence of such allegations against Hand, the court ruled that he was entitled to summary judgment as to the claims filed against him in his individual capacity.

## Case No. A91A1533

1. Appellant contends that the trial court erred in failing to hold that the defense of sovereign immunity was waived through the county's establishment and funding of a program of "self-insurance." He relies on the provision in the Georgia Constitution of 1983, Art. I, Sec. II, Par. IX, that "the defense of sovereign immunity is waived as to those actions for the recovery of damages for any claim against the state or any of its departments and agencies for which liability insurance protection for such claims has been provided but only to the extent of any liability insurance provided."[1] He also contends that counties constitute "departments and agencies" of state government under Paragraph IX. That is correct. *Toombs County v. O'Neal*, 254 Ga. 390 (1) (330 SE2d 95) (1985) (three-justice plurality opinion). See also *Ostuni Bros. v. Fulton County Dept. of Public Works*, 184 Ga. App. 406, 407 (1) (361 SE2d 668) (1987) (cert. denied, see 184 Ga. App. at 910). The question, then, is whether the county's sovereign immunity was waived.

The Deputy Director of Finance for Risk Management for DeKalb County testified that in prior years the county had purchased liability insurance policies for its law enforcement personnel and public officials, but in 1985 the county allowed these policies to lapse because the premiums had become too expensive.

Afterwards, the county took the monies which would have been used to pay those liability insurance premiums and established a defense and indemnification fund pursuant to OCGA §§ 45-9-21 and 45-9-22, which are part of Title 45, Chapter 9, Article 2. As we read the Code sections comprising Article 2 (OCGA §§ 45-9-20 through 45-9-23), it is their intent, with certain exceptions, to authorize a county, municipality, or other public body to purchase insurance or adopt policies to indemnify governmental employees or officers against *personal* liability for damages arising out of the performance of their duties (OCGA §§ 45-9-20; 45-9-22), and to defend actions in which such damages are sought (OCGA § 45-9-21), in those instances in which a defense of sovereign or official immunity is unavailable (OCGA § 45-9-23). Compare OCGA § 33-24-51; *Shuman v. Dyess*, 175 Ga. App. 213 (1) (333 SE2d 379) (1985). The deputy director testified that the county established the defense and indemnification fund because it did not wish to waive sovereign or official immunity. A DeKalb County ordinance, to which he referred, so provides.

---

[1] This provision was eliminated as such in the amendment of 1990, which among other things authorized the enactment of a State Tort Claims Act which could waive the state's sovereign immunity. Ga. L. 1990, p. 2435, approved in general election of 1990. Ga. L. 1991, pp. CCCXXIV, CCCXXXI.

In *Logue v. Wright*, supra at 209, the Supreme Court recognized that where a county provides a defense to employees in a legal action pursuant to OCGA § 45-9-21, it does not waive its sovereign immunity. The Supreme Court in *Logue* held "that under the statutes dealing with liability insurance for government employees and officials, only state self-insurance plans will waive sovereign immunity. There is no provision for a county to set up a self-insurance plan." See *Pizza Hut of America v. Hood*, 198 Ga. App. 112, 113 (2) (400 SE2d 657) (1990); *Hospital Auth. of Fulton County v. Litterilla*, 199 Ga. App. 345, 350 (2a) (404 SE2d 796) (1991). However, the Supreme Court granted certiorari in *Litterilla* and has recently held that commercial liability insurance together with a self-insurance plan waives the sovereign immunity which a county hospital authority would otherwise have. *Litterilla v. Hosp. Auth. of Fulton County*, 262 Ga. 34 (413 SE2d 718) (1992). Nonetheless, the Supreme Court continued to recognize that plans such as the one here are in essence additional employee benefits and do not waive the government entity's sovereign immunity. *Litterilla*, supra at 36. DeKalb County's fund here at issue is simply one which provides a benefit "[i]n addition to . . . other compensation. . . ." OCGA § 45-9-20.

Under *Logue* and in conformity with OCGA § 45-9-23, the maintenance of the fund for personal liability does not waive sovereign immunity, and since that aspect of the *Logue* decision was approved in *Litterilla*, we hold that the county's establishment and maintenance of the defense and indemnification fund for its personnel does not constitute a waiver of its sovereign immunity.

2. Appellant contends that the trial court erred in granting summary judgment to the county based on the defense of sovereign immunity, and to Pirkle and Hand in their official capacities based upon a defense of official immunity.

(a) "The doctrine of sovereign immunity has been recognized in this state since the adoption of the common law. [Cit.] It also applies to political subdivisions of the state, including counties. [Cits.]" *Hennessy v. Webb*, 245 Ga. 329 (264 SE2d 878) (1980). "A county is not liable to suit for any cause of action unless made so by statute." OCGA § 36-1-4; *Shuman*, supra at 215. "The General Assembly may waive the immunity of counties, municipalities, and school districts by law." Ga. Const. of 1983, Art. IX, Sec. II, Par. IX; *Toombs County*, supra at 391.

" 'Any suit against an officer or agent of the State, in his official capacity, in which a judgment can be rendered controlling the action or property of the State in a manner not prescribed by statute, is a suit against the State . . .' and cannot be maintained without its consent. [Cit.]" *Hennessy*, supra at 330.

Under sovereign immunity principles, a public officer or em-

ployee, acting within the scope of his authority and engaged in discretionary as opposed to ministerial functions, is entitled to immunity from suit provided the acts complained of are done within the scope of the officer's authority and without wilfulness, fraud, malice or corruption. Id. at 331.

(b) As previously stated, a county is a "department" or "agency" of the State under Paragraph IX, which provides, following the part quoted above: "[T]he sovereign immunity of the state or any of its departments and agencies may hereafter be further waived by Act of the General Assembly which specifically provides that sovereign immunity is hereby waived and the extent of the waiver."

(c) The question in this case is whether the General Assembly, in its enactment of the "Georgia Emergency Telephone Number '911' Service Act," OCGA § 46-5-121, has waived defenses of sovereign and official immunity which could otherwise be asserted by the county and its employees and officers in their implementation and operation of the "911" telephone system.

This Act charges the Telecommunications Division of the Department of Administrative Services with responsibility for developing a plan for implementing a state-wide emergency telephone number "911" system. OCGA § 46-5-124 (a). Subject to certain requirements, local government, such as DeKalb County, may operate an emergency "911" system or contract with a service supplier for the operation of such a system. OCGA § 46-5-133. A service supplier is a local telephone exchange service facilitating the placement of telephone calls within an emergency "911" system. OCGA § 46-5-122 (3) and (9).

Questions concerning the availability of the defenses of sovereign and official immunity in this case are based on the interpretation of OCGA § 46-5-131 (a). It provides: "Whether participating in a statewide emergency '911' system or an emergency '911' system serving one or more local governments, neither the state nor any local government of the state nor any emergency '911' system provider, its employees, directors, officers, and agents, except in cases of wanton and willful misconduct or bad faith shall be liable for death or injury to the person or for damage to property as a result of either developing, adopting, establishing, participating in, implementing, maintaining, or carrying out duties involved in operating the '911' emergency telephone system. . . ."

In keeping with sovereign immunity principles, OCGA § 46-5-131 (a) does manifest an intent not to impose liability upon any person or entity providing emergency "911" telephone services, "except in cases of wanton and willful misconduct or bad faith." However, in order to hold the county vicariously liable for the "wanton and wilful misconduct or bad faith" of its officers and employees under Paragraph IX,

it would be necessary for us to hold that OCGA § 46-5-131 (a) "specifically provides that sovereign immunity [of the county] is hereby waived and the extent of the waiver." On its face, OCGA § 46-5-131 (a) does not do this. Compare OCGA § 46-5-131 (b), which provides that no local government shall be required to indemnify or defend any emergency "911" system provider from any liability arising from subsection (a) unless the local government has agreed to assume such obligation; OCGA § 46-5-135, which provides that a service supplier is not liable for any act or omission of its employees, directors, officers, or agents "except for willful or wanton misconduct." Therefore, there is no waiver of the county's immunity.

3. Appellant contends that the trial court erred in dismissing his § 1983 claims.

Section 1983 imposes liability where persons acting under color of state law have deprived an individual of a federal constitutional or statutory right. *Wideman v. Shallowford Community Hosp.*, 826 F2d 1030, 1032 (11th Cir. 1987). Federal constitutional law does not require a state to provide its citizens with protective services in the event of medical emergencies. Even if the state undertakes to provide such services, its failure to render same in a proper manner or in violation of state law does not violate the Due Process Clause of the United States Constitution, unless the state created the medical emergency or the person was in state custody or control at the time of the emergency. *DeShaney v. Winnebago County Dept. of Soc. Svcs.*, 489 U. S. 189 (109 SC 998, 103 LE2d 249) (1989). See *Cleveland v. Fulton County*, 196 Ga. App. 168, 169 (1) (396 SE2d 2) (1990) and cits.; accord *Davis v. City of Roswell*, 250 Ga. 8 (295 SE2d 317) (1982). The state did not create Hendon's medical emergency, and he was not in state custody or control.

4. For reasons given in Division 5, infra, the last enumeration of error, concerning the trial court's refusal to allow the addition of named party defendants in lieu of generic defendants after their identities were ascertained, is moot.

## Case No. A91A1534

5. Sergeant Pirkle contends that the trial court erred in denying his motion for summary judgment on grounds of official immunity, in that the court applied an incorrect legal standard for determining whether a county employee is entitled to official immunity from suit in his individual capacity.

OCGA § 46-5-131 (a) provides that an employee of a local governmental unit providing an emergency "911" telephone system shall not be liable "except in cases of wanton and willful misconduct or bad faith."

Wanton and wilful conduct differs from gross negligence. *Truelove v. Wilson,* 159 Ga. App. 906, 908 (4) (285 SE2d 556) (1981). Wilful conduct is based on an actual intention to do harm or inflict injury; wanton conduct is that which is " 'so reckless or so charged with indifference to the consequences . . . as to justify the jury in finding a wantonness equivalent in spirit to actual intent.' [Cit.]" *Id.* " 'Bad faith' is not simply bad judgment or negligence, but it imports a dishonest purpose or some moral obliquity, and implies conscious doing of wrong, and means breach of known duty through some motive of interest or ill will. [Cit.]" *Vickers v. Motte,* 109 Ga. App. 615, 619 (137 SE2d 77) (1964).

There is no evidence to support a finding that Sergeant Pirkle engaged in "wanton and wilful misconduct or bad faith," as opposed to gross negligence. See *Truelove,* supra; *King v. Smith,* 47 Ga. App. 360, 366 (170 SE 546) (1933); accord *Holloway v. Dougherty County School System,* 157 Ga. App. 251 (277 SE2d 251) (1981); compare *Vickers,* supra; *Central of Ga. R. Co. v. Moore,* 5 Ga. App. 562, 565 (63 SE 642) (1908).

Relating to Division 4 above, there is likewise no evidence which would support findings that the other individuals which Hendon seeks to hold personally liable engaged in "wanton and willful misconduct or bad faith." As acknowledged by Hendon, even though the unnamed defendants were not made parties, discovery in this case was undertaken and the evidence was developed as though they had been made parties.

Thus, summary judgment was required as to these defendants also because defendant Pirkle "demonstrate[d] by reference to evidence in the record that there is an absence to support at least one essential element of the non-moving party's [i.e., plaintiff Hendon's] case." *Lau's Corp. v. Haskins,* 261 Ga. 491, 495 (405 SE2d 474) (1991).

*Judgment affirmed in Case No. A91A1533. Judgment reversed in Case No. A91A1534. Johnson, J., concurs. Carley, P. J., concurs in the judgment only.*

### On Motion for Reconsideration.

1. That aspect of the *Logue* decision upon which our holding is based in Division 2 was not disapproved in the Supreme Court's decision in *Hiers v. City of Barwick,* 262 Ga. 129 ( 414 SE2d 647) (1992).

2. We deal with the question of whether defenses of sovereign and official immunity have been waived based on our interpretation of OCGA § 46-5-131 (a), in Division 2 (c) of the opinion (p. 756). That statute, as amended by Ga. L. 1990, p. 179, § 2, provides for liability in cases of "wanton and willful misconduct or bad faith" of a "911"

system provider's employees, directors, officers, and agents.

Hendon argues on motion for reconsideration that this case is controlled by OCGA § 46-5-131, as enacted by Ga. L. 1984, p. 652, § 1, which provided for liability in cases of "willful misconduct, gross negligence, or bad faith."

Hendon is incorrect. It is well recognized that a reviewing court should apply the law as it exists at the time of its judgment, when no vested right will be adversely affected. *Evans v. Belth*, 193 Ga. App. 757, 759 (388 SE2d 914) (1989). Until the time for review has passed, a party has no vested right to a cause of action which has been removed by legislative enactment. *Hensel Phelps Constr. Co. v. Johnson*, 161 Ga. App. 631, 632 (295 SE2d 843) (1982), rev'd on other grounds *Johnson v. Hensel Phelps Constr. Co*, 250 Ga. 83 (295 SE2d 841) (1982).

DECIDED MARCH 18, 1992 —
RECONSIDERATION DENIED APRIL 3, 1992 —

*The Keenan Ashman Firm, Don C. Keenan, David S. Bills,* for appellant.

*Johnson & Montgomery, Albert S. Johnson, Susan C. Mullis,* for appellees.