[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 06-11311

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 21, 2007
THOMAS K. KAHN
CLERK

D. C. Docket No. 01-00994 CV-F-E

ACTION MARINE, INC.,
JOHN THARPE, et al.,

Plaintiffs-Appellees,

versus

CONTINENTAL CARBON INCORPORATED ,
CHINA SYNTHETIC RUBBER CORPORATION,

Defendants-Appellants.

Appeals from the United States District Court
for the Middle District of Alabama

**(March 21, 2007)**

Before DUBINA and WILSON, Circuit Judges, and CORRIGAN,* District Judge.

———————————

*Honorable Timothy J. Corrigan, United States District Judge for the Middle District of Florida, sitting by designation.

DUBINA, Circuit Judge:

Appellants, Continental Carbon Co., Inc. ("CCC"), and its parent company,

China Synthetic Rubber Corp. ("CSRC") (collectively, "Continental"),[1] defendants

in the underlying lawsuit, appeal the district court's denial of their post-trial

motion for judgment as a matter of law or, in the alternative, a new trial or, in the

alternative, an amendment of the final judgment (hereinafter "post-trial motion").

Having reviewed the parties' briefs and the evidence in the record, and with the

benefit of oral argument, we affirm the district court's order and the judgment

entered on the jury's verdict.

## I.    BACKGROUND

A.    *Facts*

Continental owns and operates a manufacturing plant in Phenix City,

Alabama, that produces carbon black, a substance the company describes as

follows:

> a highly engineered product manufactured by heating feedstock oil to
> a high temperature in a low-oxygen reactor.  The resulting product is
> smoke that includes both carbon black and waste gases.  The carbon
> black is separated from the gases, processed, and formed into small

---

[1]CSRC's relationship with CCC was the subject of some dispute during this litigation, including the trial; however, in this appeal, CSRC does not challenge the district court's finding that it is CCC's parent corporation, and CSRC does not now deny making decisions that exposed it to liability in the instant case.  Nor do the defendants contend that information known by CCC's management should not be imputed to CSRC.

2

> pellets for ease of handling and shipment. [Continental] sells carbon black for use in making tires, rubber and plastic items, inks, and other . . . products.

[Appellants' Br. at 3 (citations to the record omitted)].

According to trial testimony, the separating process occurs in stages using filters located in what is known in the industry as bagfilter compartments. Pressurized smoke carries carbon black through the compartments, where the bagfilters capture the carbon black. In a closed system such as exists in the Phenix City plant, if everything is working perfectly, no carbon black should escape, and the remaining gasses are expelled through exhaust towers.

Originally, the Phenix City plant housed one production unit ("Unit 1"). Although Continental received complaints from neighboring property owners regarding carbon black emissions from this unit, the damage giving rise to the present lawsuit occurred in conjunction with Continental's efforts to double the plant's production by commissioning a second unit in 1999 ("Unit 2"). Along with the construction of Unit 2, Continental installed a thermal oxidizer for the purpose of combusting any carbon black particles that escape either production unit before the air emanating from the bagfilter compartments is expelled.

The appellees (collectively, "the property owners"), which include the City of Columbus, Georgia ("the City"), own property located across the

3

Chattahoochee River and within approximately 1 ½ miles from Continental's Phenix City plant.[2] The property owners, all of whom are Georgia citizens, also include Action Marine, Inc. ("Action Marine"), which during the relevant time operated a retail boat sales and maintenance business along the river; John Tharpe ("Tharpe"), Action Marine's sole shareholder and principal agent; and Owen Ditchfield ("Ditchfield"), who owns a residence and rental home in the area.

According to the property owners, the Phenix City plant repeatedly emitted carbon black into the air, which then carried the pollutant, known to be oily, adhesive, and penetrating, onto their properties, thereby darkening them. Specifically, the City contends that the carbon black damaged the Columbus Civic Center both externally and internally via the facility's air intake system. Other City-owned properties allegedly damaged include recreational facilities located in the City's South Commons Sports and Entertainment Complex as well as Rigdon Park. In pursuing this civil action, the City sought damages for cleanup and monitoring costs. Ditchfield sought damages for cleanup costs, diminution of property value, and emotional distress in connection with carbon black contamination of both of his properties.

---

[2]Some of the properties are only approximately a ½ mile from Continental's Phenix City plant.

Action Marine alleges that the carbon black damaged its inventory of boats to such an extent that the company was forced to sell those it could at a loss. Creditors eventually repossessed Action Marine's boat inventory, which Tharpe had personally guaranteed, and the business shut down. Action Marine sought damages to recover for the lost value of its business.

When Action Marine's creditors failed to recoup all that was owed from the company, they pursued deficiency judgments against Tharpe personally. To make matters worse, unable to return customers' boats in a clean condition and thought by some to be selling used boats as new, Tharpe became the butt of jokes among the fishermen who had formerly patronized his business. Tharpe therefore sought damages for emotional distress and loss of reputation.

Importantly, the property owners accused Continental of intentionally damaging their properties. They claimed that Continental chose to continue operating its Phenix City plant despite knowing that the plant's constant leaks were polluting their properties. Rather than fix the leaks, the property owners contend, Continental engaged in a strategy of denial, deception, and subterfuge. Therefore, the property owners sought punitive damages.

B.    *Procedural History*

Alleging diversity jurisdiction pursuant to 28 U.S.C. § 1332 (2000), Action Marine and Tharpe originally filed this lawsuit as a class action stating common law tort claims of negligence, wanton conduct, breach of duty to warn, fraud, misrepresentation, deceit, nuisance, trespass, and strict liability. In addition to Continental, named defendants included Taiwan Cement Corp. ("Taiwan") as well as Charles Barry Nicks ("Nicks") and Todd Miller ("Miller"), both individually and in their representative capacity as agents of Continental.

Eventually, the City, Ditchfield, and Phillips Homes, Inc. ("Phillips"), were added as plaintiff class representatives, but the district court subsequently denied class certification. The district court then granted summary judgment in favor of Taiwan and the individual defendants, Nicks and Miller, on all claims against them. The court also granted summary judgment in favor of the remaining defendants on the claims of fraud, misrepresentation, deceit, and strict liability as well as the City's and Action Marine's claims for emotional distress. Phillips stipulated to a dismissal of its claims without prejudice, and the remaining plaintiffs acquiesced in the dismissal of the claim alleging a breach of a duty to warn. Therefore, the lawsuit proceeded to trial on the property owners' claims of negligence, wanton conduct, nuisance, and trespass.

After a 10-day trial, an Alabama jury returned a verdict in favor of the property owners on all claims and determined that Continental's actions warranted punitive damages. The jury awarded compensatory damages in the amounts of $45,000 to Ditchfield; $100,000 to Tharpe; $570,000 to the City; and $1.2 million to Action Marine for a total of $1,915,000. The jury also awarded $1,294,000 in attorney fees and assessed punitive damages at $17.5 million.

Following entry of the final judgment on the jury's verdict, Continental timely filed its post-trial motion challenging the sufficiency of the evidence presented in support of the tort claims as well as the amount and propriety of the compensatory and punitive damages awarded. Prior to ruling on the motion, the district court determined that the property owners were entitled to permanent injunctive relief, to which the parties later consented. Approximately six months after entry of final judgment on the claims for injunctive relief, the district court denied Continental's post-trial motion. Continental now appeals that decision.[3]

## II. ISSUES

1.      Whether the evidence was sufficient to reasonably infer that carbon black was a cause-in-fact of the alleged discoloration.

---

[3]Continental concomitantly appealed the award of injunctive relief; we have already dismissed that aspect of the appeal as untimely.

7

2. Whether the evidence was sufficient to reasonably infer that Continental acted with the mental state required by Georgia law to prove the property owners' claims and lift Georgia's statutory cap on punitive damages awards.

3. Whether the compensatory damages awarded to Action Marine were improper.

4. Whether Tharpe, as personal guarantor of Action Marine's debt and its principal agent, may pursue a claim against Continental for emotional distress and/or loss of reputation.

5. Whether the punitive damages award was unconstitutionally excessive.

## III. STANDARDS OF REVIEW

We review the "denial of a motion for judgment as a matter of law *de novo*, and will reverse only if 'the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict.'" *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 945 n.12 (11th Cir. 2005), *cert. denied*, 126 S. Ct. 2967 (2006). *De novo* review is the proper standard also for reviewing the district court's denial of judgment as a matter of law with respect to the claims for punitive damages. *Boyd v. Homes of Legend, Inc.*, 188 F.3d 1294,

1298 n.9 (11th Cir. 1999) (noting that the issue "presents a pure question of law"); *see also Toole v. Baxter Healthcare Corp.*, 235 F.3d. 1307, 1317 (11th Cir. 2000).

The district court's denial of a motion for a new trial is reviewed for an abuse of discretion. *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1247 (11th Cir. 2001). "Deference to the district court 'is particularly appropriate where a new trial is denied and the jury's verdict is left undisturbed,'" as in this case. *Id.* at 1247-48 (quoting *Rosenfield v. Wellington Leisure Prods., Inc.*, 827 F.2d 1493, 1498 (11th Cir. 1987)).

Finally, the district court's decision to sustain the amount of compensatory and punitive damages awards pursuant to state law is reviewed for "clear abuse of discretion." *Middlebrooks*, 256 F.3d at 1249. Its decision that the punitive damages award does not run afoul of the federal Constitution, however, is subject to *de novo* review, though we "defer to the District Court's findings of fact unless they are clearly erroneous." *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436, 440 n.14, 121 S. Ct. 1678, 1685-86, 1688 n.14 (2001).

## IV.  DISCUSSION

### A.  *Causation*

Continental contends that the evidence at trial was insufficient to support an award with respect to any of the property owners' tort claims. Focusing solely on

9

the scientific evidence offered through the parties' experts, Continental argues that the property owners failed to prove that carbon black, as opposed to other ostensibly dark substances, caused any of the damage alleged. Alternatively, according to Continental, the scientific evidence similarly failed to demonstrate that the damage attributable to carbon black was "substantial," which Continental argues is required to prove the trespass and nuisance claims.

1. *In General*

According to Continental, chemical analyses conducted by the parties' experts failed to establish the presence of any carbon black on several of the City's properties at issue and, with respect to all but one of the remaining properties, established a concentration of less than one percent of the total dark material on the property. Consequently, Continental contends, the testing proved at most that carbon black caused *de minimis* damage.

At oral argument, the property owners conceded that two of the properties allegedly damaged, for which the jury awarded compensatory damages, tested negative for carbon black but contended nonetheless that the location of these two properties and the similarity between their discoloration and that of the neighboring properties that tested positive for carbon black allow for an inference

10

that carbon black caused the damage alleged.[4]  The property owners rely on circumstantial evidence as well to counter Continental's claim that the positive test results revealed only trace amounts of carbon black.

The scope of our inquiry is defined by the arguments raised in the parties' briefs.  Importantly, Continental does not dispute that all of the properties at issue were discolored and does not contend that the discoloration itself was insubstantial.  Nor does Continental contend that the observable discoloration of the properties differed materially from one property to another.  Furthermore, Continental does not attempt to convince us that the discoloration was not *suggestive* of carbon black.[5]  Instead, Continental contends that no reasonable fact finder could conclude that the discoloration was in fact caused by carbon black

---

[4]The property owners focus on the issue of proximate cause.  Continental's relevant arguments are limited to the issue of factual causation, however, and Continental actually acknowledges that cases addressing the issue of proximate cause "are inapposite." [Reply Br. at 7 n.6].  Therefore, we are concerned only with factual causation.

[5]Continental denies the ability to accurately identify carbon black with the naked eye; however, evidence in the record includes contradictory testimony from CCC employees.  For example, Ng-Leng Lee, a plant manager for CCC and at one time plant manager in Phenix City, testified at his deposition that he believed CCC employee Greg Johnstone, who had reported a complaint of carbon black fallout, was capable of recognizing carbon black pollution upon seeing it.  In addition, Nicks testified that he paid a car dealership with his own money to have cars cleaned after inspecting the vehicles and satisfying himself (though not to a scientific certainty) that the cars had been blanketed with carbon black from the Phenix City plant.  Also, the property owners' microscopist, Garth Freeman, Ph.D., who specializes in carbon analysis, testified that the effects of carbon black deposits are visible without a microscope and "can form a comet appearance when it lands on material, and so in some circumstances there are physical appearances of the way carbon black might deposit that would strongly indicate that that was carbon black." [Trial Tr. at 862].

11

without a chemical analysis establishing the presence of carbon black in such concentrations as to compel the conclusion that carbon black, and nothing else, caused the alleged discoloration.

Our substantive legal analysis in this diversity case is governed by Georgia law, which provides that "[a]s a general rule, issues of causation are for the jury to resolve and should not be determined by a trial court as a matter of law except in plain and undisputed cases." *Ogletree v. Navistar Int'l Transp. Corp.*, 535 S.E.2d 545, 548 (Ga. Ct. App. 2000).

> With respect to factual causation . . .[, while] a reasonable inference sufficient to create a trial issue of fact cannot be based on mere possibility, conjecture, or speculation . . .[, t]he plaintiff [need only] . . . introduce evidence which affords a *reasonable basis* for the conclusion that it is more likely than not that the conduct of the defendant was *a* cause in fact of the result.

*Id.* (citations & quotations omitted) (emphasis added).

Viewed in the plaintiffs' favor, the evidence at trial, which included numerous documents and photographs as well as testimony from Ditchfield, Tharpe, the Mayor of Columbus, employees (past and present) of CCC, and experts in microscopy, air quality, and wind direction modeling, tended to show that (1) Continental's Phenix City plant emitted carbon black on numerous, perhaps innumerable, occasions during the relevant time period; (2) wind carrying

12

carbon black from the Phenix City plant frequently blew toward the property owners' properties; (3) the properties were in close proximity to the plant; (4) the properties all were similarly discolored; and (5) the dark substance on the properties was at least reasonably suggestive of carbon black. Furthermore, most of the samples the property owners' expert obtained from the properties tested positive for carbon black, and the properties that tested negative were located immediately adjacent to properties with positive test results.

Surely a fact finder would welcome a chemical analysis establishing to a scientific certainty the presence and precise concentration of the pollutant on the properties allegedly damaged. In the instant case, the jury was free to hold the property owners accountable for failing to provide such certainty, but Continental has failed to cite any Georgia case that requires the property owners to establish scientific certainty.[6] We conclude that such precision is not necessary in this case. The evidence in the record provides a reasonable basis for concluding that

---

[6]*Satterfield v. J.M. Huber Corp.*, 888 F. Supp. 1567, 1570-71 (N.D. Ga. 1995), the case on which Continental primarily relies, is inapposite because the *Satterfield* court relied on a lack of evidence, generally, and specifically noted the lack of any expert testimony whatsoever regarding the issue of causation.

Continental's carbon black caused the discoloration alleged.[7]  Georgia law requires nothing more.

2.      *Substantial Damage*

Continental contends that the property owners cannot succeed on their trespass and nuisance claims unless they can prove that the damage caused by carbon black was "substantial." [Appellant's Br. at 20].  We do not need to decide whether Continental's view of Georgia law is correct.

As already noted, Continental does not contend that the discoloration alleged by the property owners was insubstantial.  Relying again on the results of the microscopic analyses conducted by the parties' experts, Continental merely contends that the property owners failed to demonstrate that carbon black was the cause of this damage.  Because we have already determined that the property owners' circumstantial evidence was sufficient to prove that carbon black caused the discoloration, it follows that the evidence also was sufficient to prove that carbon black caused substantial damage to all of the properties.  *Holman v. Athens Empire Laundry Co.*, 100 S.E. 207, 210 (Ga. 1919) (holding that for smoke to

---

[7]We note that the only other circuit to address a similar argument in a case factually on point is in agreement.    *Bradley v. Armstrong Rubber Co.*, 130 F.3d 168, 173-74 (5th Cir. 1997) (concluding that scientific testing was not required for a jury to infer the presence of carbon black).

constitute a nuisance "it must be such as to produce a visible, tangible, and appreciable injury to property").

## B. *Continental's Culpability*

Continental contends that the evidence was insufficient to satisfy the scienter requirements of the property owners' wanton conduct, trespass, and punitive damages claims as well as that which is necessary to overcome Georgia's cap on punitive damages. The latter standard requires a showing of "specific intent to cause harm" and thus erects the highest scienter obstacle the property owners needed to overcome.[8] O.C.G.A. § 51-12-5.1(f), (g) (2000). A showing of specific intent to cause harm necessarily would satisfy the other scienter requirements; therefore, we begin our analysis with Continental's argument that

---

[8] "[W]anton conduct is that which is 'so reckless or so charged with indifference to the consequences . . . as to justify the jury in finding a wantonness equivalent in spirit to actual intent.'" *Hendon v. DeKalb County*, 417 S.E.2d 705, 712 (Ga. Ct. App. 1992) (quoting *Truelove v. Wilson*, 285 S.E.2d 556, 559 (Ga. Ct. App. 1981)), *quoted in Chrysler Corp. v. Batten*, 450 S.E.2d 208, 212 (Ga. 1994). Trespass to personal property requires a showing of willful damage, O.C.G.A. § 51-10-6(a) (2000), which equates to an "actual intention to do harm or inflict injury." *Hendon*, 417 S.E.2d at 712. A showing of either willfulness or wantonness is sufficient to satisfy the standard for awarding punitive damages. O.C.G.A. § 51-12-5.1(b) (2000). We note also that the property owners must prove their entitlement to punitive damages with clear and convincing evidence. O.C.G.A. § 51-12-5.1(b).

Continental has waived its argument on appeal that, under Georgia law, the tort of wanton conduct applies only in conjunction with a risk to "human life." [Appellant's Br. 12]. Continental failed to object to the district court's relevant jury instruction or raise this argument before the district court in its post-trial motion. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331-35 (11th Cir. 2004) (discussing this circuit's frequently applied rule that we will not consider "an issue . . . raised for the first time in an appeal").

15

Georgia's statutory cap limiting punitive damages requires us at least to grant a remittitur. Because we conclude from the record that the evidence was sufficient to prove that Continental acted with specific intent to cause harm, it is unnecessary to discuss Continental's arguments concerning the other scienter requirements.

Preliminarily, we recognize that an appellant challenging a jury finding regarding an actor's state of mind faces a formidable hurdle. We long ago cautioned courts in granting judgment as a matter of law "when resolution of the dispositive issue requires a determination of state of mind. Much depends on the credibility of the witnesses testifying as to their own states of mind." *Croley v. Matson Navigation Co.*, 434 F.2d 73, 77 (5th Cir. 1970).[9] Accordingly, we afford great deference to the jury's relevant conclusions as well as those of the district judge first asked to overturn the jury's finding.

1. *The Meaning of Specific Intent to Cause Harm*

By statute, Georgia caps punitive damages at $250,000 per plaintiff unless "it is found that the defendant acted, or failed to act, with the specific intent to cause harm." § 51-12-5.1(f), (g); *see also Bagley v. Shortt*, 410 S.E.2d 738, 739 (Ga. 1991) (holding that the cap establishes a limit on the amount that can be

---

[9]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

awarded "*any one plaintiff*").  Reading into the term "specific intent" a requirement that the property owners demonstrate that Continental acted for the sole nefarious purpose of injuring them, both Continental and the U.S. Chamber of Commerce ("Chamber"), as *amicus curiae*, contend that the property owners fell short.  Continental has waived a key aspect of this argument, however.

At trial and without objection, the district court instructed the jury that "[s]pecific intent to cause harm is where the actor desires to cause the consequences of his act or where the actor believes that the consequences of his act are substantially certain to result from [it]." [Trial Tr. 2,027].  This language reflects, *verbatim*, the definition adopted by the Georgia Court of Appeals, which equates specific intent in the punitive damages context to intent as defined in the Restatement (Second) of Torts.  *See J.B. Hunt Transport, Inc. v. Bentley*, 427 S.E.2d 499, 504 (Ga. Ct. App. 1992); *Viau v. Fred Dean, Inc.*, 418 S.E.2d 604, 608 (Ga. Ct. App. 1992); Restatement (Second) of Torts § 8A (1965); *see also* Council of Superior Court Judges, Georgia Suggested Pattern Jury Instructions, Vol. I: Civil Cases, § 66.711 (4th ed. 2004) (suggesting the same definition that the district court utilized in this case and the Georgia Court of Appeals utilized in *Bentley* and *Viau*).

Continental now contends that specific intent requires something more. In essence, Continental and the Chamber contend that the consequences of Continental's actions or inaction must have been not only substantially certain to result but also the end purposely sought. Thus, to avoid the cap, according to Continental and the Chamber, the property owners must demonstrate that Continental continued to operate its leaky facility *in order to* pollute the property owners' properties rather than, for example, to make or save money.

At trial, Continental failed to object to the relevant jury instruction and later failed to raise this same argument in its post-trial motion. Indeed, Continental's brief in support of its post-trial motion unequivocally adopted the district court's definition after noting Georgia's reliance on the Restatement. [Br. in Supp. of Defs.' Post-Trial Mot. at 20]. Not only has Continental failed to acknowledge its lack of objection to the jury instructions, but it has also failed to argue for the application of one of the exceptions to our rule regarding a party's waiver of an issue raised for the first time on appeal. *See*, *e.g.*, *Access Now, Inc.*, 385 F.3d at 1331-35; *see also supra* note 8. Moreover, in its brief on appeal, Continental neither expressly challenges the district court's jury instruction nor requests a

review of the instruction for plain error. *See* Fed. R. Civ. P. 51(c) & (d).

Consequently, Continental has waived this argument.[10]

We therefore decline to consider whether Continental's proffered definition of "specific intent," to the extent it diverges from the definition provided by the district court, is correct. Instead, we review the evidence in the record to determine whether it allows for an inference that Continental at least believed that the contamination was "substantially certain" to result from its actions or inaction. We conclude that the evidence was sufficient to support such a finding.[11]

2.     *Sufficiency of the Evidence*

The evidence at trial demonstrated that by the late 1990s, if not sooner, Continental was aware that Unit 1 had fallen into a state of disrepair, a condition Nicks, the Phenix City plant manager from 1999 to 2004, agreed was

---

[10]We disagree with Continental's contention that we must entertain its argument anyway and find that the cases upon which Continental relies have no bearing in this case. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 513-14, 108 S. Ct. 2510, 2519-20 (1988) (concluding only that it was not impermissible for the Fourth Circuit Court of Appeals to issue a ruling based on a legal standard different from the standard provided in the district court's jury instructions); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 120, 108 S. Ct. 915, 922 (1988) (holding that the defendant's failure to object to a jury instruction would not foreclose review of the relevant legal issue raised on appeal when the defendant's "legal position in the District Court . . . was consistent with the legal standard it" advocated on appeal, and the Court of Appeals had "very clearly considered, and decided," the issue on appeal).

[11]Continental similarly waived its current arguments that it lacked notice of the possibility that the district court would interpret the specific intent requirement as it did and that the Rule of Lenity compels an alternate interpretation.

"deplorable." [Trial Tr. at 389]. In 1998, Ken Wilder, at the time the Phenix City

plant manager, along with Todd Miller, then CCC's Corporate Director of Safety,

Health, and Environmental Affairs, attended a citizens meeting at the Columbus

City Manager's office. [Pls.' Ex. 2]. According to Wilder's notes, which he

submitted in a memorandum to Nicks, the purpose of the meeting was to discuss

complaints of pollution that the citizens apparently believed was carbon black.

The citizens provided detailed descriptions of the fallout on their property, and

Ditchfield discussed problems he had been having since 1982. Notably, Wilder's

memorandum acknowledged that "[i]n 1982 the plant had a problem resulting in

carbon black on residents[' homes] in the Oakland Park area. Continental Carbon

paid to have the homes of residents cleaned." [Pls.' Ex. 2-1]. Nevertheless,

pointing to chemical analyses conducted by McCrone Associates, Inc., and

referring to the "elemental composition" of the samples tested, Wilder assured the

attendees that the pollution was not carbon black despite knowing that at least one

of McCrone's previous analyses suggested that it was.[12]

---

[12]Approximately one year before the meeting with the Columbus citizens, CCC had submitted a sample of dark material from Action Marine to McCrone for an analysis. McCrone shared the results with Gary Shafer, then the Phenix City plant's Director of Safety, Health, and Environmental Affairs. According to McCrone's report, the carbon black reference sample provided by CCC contained primarily carbon and a trace of sulfur. The Action Marine sample contained, *inter alia*, carbon and sulfur, which McCrone somewhat dismissively concluded "may indicate a trace of your carbon black." [Pls.' Ex. 80-1].

Apparently dissatisfied with Continental's explanation, the complaints continued, and Nicks, after becoming plant manager, grew increasingly disgusted with the condition of the facility. Around that same time, two separate teams of CCC employees, one of which included Nicks, evaluated Unit 1 and recommended destructing and rebuilding the system almost entirely. CSRC then sent a team of its own, which arrived at a different conclusion and recommended not rebuilding Unit 1.[13] Continental scrapped the project and did not resume meaningful efforts to resuscitate the rebuilding plan until 2004. Even then, internal company e-mails revealed, Continental planned to extend completion of the project to at least 2006.

In 1999, Continental constructed Unit 2 and installed the thermal oxidizer. When developing plans for Unit 2, Continental made an economic decision to limit the number of bagfilter compartments, thereby rendering Unit 2 incapable of

---

At trial, Nicks testified regarding this analysis and described McCrone as an "independent laboratory." [Trial Tr. at 287]. The jury was free to conclude otherwise. In a facsimile transmission to Tharpe informing him of the test results, McCrone described the elemental composition of the sample, including the existence of carbon and sulfur. Despite having already conveyed to CCC the possibility that the sample contained carbon black, McCrone's note to Tharpe concluded, "Therefore, although the black particulate on the wipe looks like the carbon black both visually and with the microscope, *the elemental data show the two to be different*." [Pls.' Ex. 80-2] (emphasis added). At trial, Nicks acknowledged that the information provided by McCrone to Tharpe was inconsistent with the information McCrone provided to CCC and agreed that one possible explanation was that McCrone had lied for CCC. [Trial Tr. at 292].

[13]Continental anticipated that rebuilding Unit 1 would cost in excess of $4 million. All expenditures exceeding $200,000 required the approval of CSRC president Peter Wu, Ph.D., who also served as CCC's chief executive officer and vice-chairman of its board.

sustaining the flow of air needed to maintain acceptable production levels. Rather than reduce production, however, Continental overloaded Unit 2, and the bagfilters, which the manufacturer designed to last one year, began splitting and leaking in half that time. Indeed, some evidence suggested that the bagfilters failed after only three or four months.

Emissions and complaints continued despite the operation of the thermal oxidizer, the supposed catchall. In April 2001, in response to complaints from Tharpe, an investigator with the U.S. Environmental Protection Agency sat across the river from the Phenix City plant and documented a carbon black emission from two exhaust stacks that CCC had not even received a permit to operate. Nicks later became aware that samples taken from Action Marine following the emission tested positive for carbon black. Approximately six months later, with no steps having been taken to correct the problems with Unit 2, Nicks sent an e-mail, copied to Juan D. Rodriguez, at the time CCC's senior vice-president of operations, describing Unit 2 as "constantly operating with some small leak up to a[n] intolerable leak." [Pls.' Ex. 5]. Nevertheless, Continental did not finally approve the addition of two bagfilter compartments until July 2002, approximately ten months later.

Continental's attitude regarding carbon black emissions was further evidenced by its failure to attempt to accurately monitor the carbon black being released into the environment. Nicks testified that he had no means of determining how much carbon black his facility released into the air. According to Nicks, the plant relied solely on employees' visual observation to determine whether any black smoke drifted from the facility. Nobody was assigned to monitor the emissions on a full-time basis, however, and testimony confirmed that visually monitoring black emissions at night from the plant was virtually impossible.

The plant did utilize an alarm system designed to detect solid and liquid particles in the exhaust plumes; however, according to Randy Wangle, a former maintenance superintendent at the Phenix City plant, Continental had a policy of simply cleaning and resetting the alarm without addressing leaks unless the alarm sounded several times within an hour.

We have closely reviewed the massive record in this case, and, as the foregoing discussion demonstrates, we conclude that the evidence, which was clear and convincing, was more than sufficient to demonstrate that Continental operated the Phenix City plant and failed to correct the problems plaguing it with

23

the "specific intent to cause harm" to the property owners, as that term is defined by the jury instructions which govern this case. [14]

C.    *Compensatory Damages*

1.    *The Proper Measure of Action Marine's Damages*

The purpose of compensatory damages is "to place an injured party in the same position as it would have been in had there been no injury . . ., that is, to compensate for the injury actually sustained." *Home Ins. Co. v. N. River Ins. Co.*, 385 S.E.2d 736, 742 (Ga. Ct. App. 1989). Continental contends that the damages awarded to Action Marine improperly include a windfall of approximately $800,000 in debt incurred in the ordinary course of business. This argument does not take into account the evidence that Continental's actions led to Action Marine's demise and thus its inability to generate revenue and repay its debts.[15] Although the parties fail to cite relevant Georgia law, the Georgia Supreme Court

---

[14]The cases upon which Continental primarily relies do not compel a different outcome. *See Wal-Mart Stores, Inc. v. Johnson*, 547 S.E.2d 320, 322-25 (Ga. Ct. App. 2001) (concluding that the evidence was sufficient to find that the defendant, Wal-Mart, acted with specific intent to harm the plaintiff despite evidence that would allow a fact finder to conclude that the plaintiff was the victim of poor communication and confusing circumstances); *Bentley*, 427 S.E.2d at 505 (finding that the cap applied in a case involving injuries caused by an exhausted truck driver); *Viau*, 418 S.E.2d at 608 (finding that the cap applied in a case involving injuries caused by an intoxicated driver).

[15]Continental does not challenge the sufficiency of the evidence linking its carbon black to Action Marine's closing beyond what has already been discussed. Therefore, we assume without deciding that Action Marine proved that the discoloration of its boats proximately caused its insolvency.

rejected an argument similar to Continental's in circumstances sufficiently similar to the instant case for this court to do the same. *See Bennett v. Smith*, 267 S.E.2d 19, 19-20 (Ga. 1980).[16]

Without objection from Continental, at trial Action Marine presented as an expert Edward Sauls, who was at the time a certified public accountant, certified valuation analyst with an accreditation in business valuation, and a certified financial forensic analyst. In great detail, Sauls explained to the jury the basis for his conclusion that an award of $1.2 million was necessary to "place [Action Marine and its owner, Tharpe] in the position financially that they otherwise would have been had it not been for the actions of the Defendant." [Trial Tr. at 1097]. In other words, he testified as to "what . . . Action Marine [would] be worth today had they not lost . . . profits." [Trial Tr. at 1110].

He further explained the three common "approaches to valuation" and led the jury through his application of the "asset-based" approach. Essentially, based on what Sauls concluded Action Marine would be worth but for Continental's

---

[16]Not entirely analogous, *Bennett* is nonetheless instructive. The plaintiffs in *Bennett* operated an egg farm and contended that the defendants had sold them contaminated feed, which "caused the plaintiffs' hens to stop laying eggs." *Id.* at 19. After distinguishing the case from more typical breach of contract cases involving incomplete transactions, the Georgia Supreme Court concluded that the plaintiffs could recover "lost revenues as damages *without deducting production expenses therefrom*, since the plaintiffs' evidence showed that they incurred the same expenses they would have incurred had the hens continued to lay eggs." *Id.* at 20 (emphasis added).

conduct, he determined that a purchaser as of the trial date would assume Action Marine's liabilities of $795,243 and pay an additional $653,166 for a total of $1,448,409. He further reduced the total to account for variables that are not important here and concluded that $1.2 million would be necessary to compensate Action Marine for the pollution damage. [Trial Tr. at 1117-18].

On cross-examination, Continental did not challenge Sauls's valuations and focused solely on the basis for his conclusion that Action Marine's losses were attributable to the carbon black contamination. Moreover, Continental neither offered an alternative methodology nor presented an expert of its own to provide a different quantum of damages. Continental now contends that Sauls's application of the asset-based approach was incorrect. We disagree. *See Dunn v. Comm'r of Internal Revenue*, 301 F.3d 339, 352-53 (5th Cir. 2002) (approaching asset-based valuation from the perspective of a "willing buyer"); *Okerlund v. United States*, 53 Fed. Cl. 341, 347 n.4 (Fed. Cl. 2002) ("Under the asset based approach, the value of a business is equal to the cost that would be incurred in acquiring a group of assets of similar utility"). Even if Sauls was mistaken in his calculations, Continental had every opportunity to highlight his error for the jury.

We conclude that the district court did not err in denying Continental's motion for remittitur or a new trial on damages. Action Marine's proffered

26

measure of damages did not impermissibly include damages not attributable to Continental's carbon black, and the expert testimony was sufficient to support the compensatory damages awarded.

2.     *Tharpe's Ability to Recover Damages*

Continental contends that Tharpe may not recover damages because his injuries, as sole shareholder of Action Marine, are derivative of his company's injuries. Again, we disagree. In Georgia, a sole shareholder's status as personal guarantor of his corporation's debt gives rise to an independent, legally compensable injury when tortious acts directed at the corporation injure the shareholder in that capacity. *William Goldberg & Co., Inc. v. Cohen*, 466 S.E.2d 872, 881-82 (Ga. Ct. App. 1995). Continental offers no reason to believe that a similar rationale would not apply with respect to the independent injuries inflicted upon Tharpe's business reputation, which was so intertwined with that of his corporation as to be virtually inseparable. *See* O.C.G.A. § 41-1-1 (1997) ("A nuisance is anything that causes hurt, inconvenience, or damage to another . . .."); *Anderson v. Fussell*, 44 S.E.2d 694, 696 (Ga. Ct. App. 1947) ("The body, reputation, and property of the citizens are not to be invaded without responsibility in damages to the sufferer."); *cf. Curl v. First Fed. Sav. & Loan Ass'n of Gainesville*, 257 S.E.2d 264, 265-66 (Ga. 1979) (upholding a jury verdict in favor

of a plaintiff in a wrongful foreclosure suit seeking damages for, *inter alia*, injury to her reputation in the community). Therefore, we conclude that the district court did not err in allowing Tharpe's claims to go to the jury.

D.      *Constitutionality of the Punitive Damages Award*

"Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *B.M.W. of N. Am., Inc. v. Gore*, 517 U.S. 559, 568, 116 S. Ct. 1589, 1595 (1996).[17] "It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419, 123 S. Ct. 1513, 1521 (2003).

The United States "Constitution imposes a substantive limit on the size of punitive damages awards[,]" however. *Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415, 420, 114 S. Ct. 2331, 2335 (1994). "A decision to punish a tortfeasor by means of an exaction of exemplary damages is an exercise of state power that must

_____

[17]Georgia law allows punitive damage awards in cases involving "aggravating circumstances in order to penalize, punish, or deter a defendant." O.C.G.A. § 51-12-5.1(a) (2000).

28

comply with the Due Process Clause of the Fourteenth Amendment." *Id.* at 434-35, 114 S. Ct. at 2342. We are therefore charged with reviewing the jury's award to determine whether it "can fairly be categorized as 'grossly excessive' in relation to" the state's legitimate interests, *Gore,* 517 U.S. at 568, 116 S. Ct. at 1595, and to "ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Campbell*, 538 U.S. at 426, 123 S. Ct. at 1524.

When determining whether a punitive damages award is unconstitutionally excessive, we are guided by "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."[18] *Id.* at 418, 123 S. Ct. at 1520. We do not view these "guideposts" as an "analytical straitjacket," *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 81 (1st Cir. 2001), and we maintain as our overarching aim eliminating the risk that a defendant is punished arbitrarily or without fair notice of the possible consequences of its actions. *Gore*, 517 U.S. at 574, 116 S. Ct. at

---

[18]Defendants do not challenge the amount of the punitive damages award as excessive under Georgia law other than as already discussed.

29

1598 (noting that due process requires a person to have "fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose").

1.  *Reprehensibility*

Of the three guideposts, the reprehensibility of a defendant's conduct is the most relevant; punitive "damages imposed on a defendant should reflect 'the enormity of his offense.'" *Gore*, 517 U.S. at 575, 116 S. Ct. at 1599.  In evaluating reprehensibility, we consider

> whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.

*Campbell*, 538 U.S. at 419, 123 S. Ct. at 1521 (citations omitted).

The reprehensibility determination "must begin with the identification of the state's interest and an assessment of the strength of that interest," which are questions of law.  *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1334 (11th Cir. 1999).  We assume from the parties' arguments that the relevant interest

30

served in this case is Georgia's "strong interest in deterring environmental pollution." *Id.* at 1335.[19]

We note that the district court found that the evidence had "established a pattern of intentional misconduct . . . leading to repeated damage to Plaintiffs' properties." The district court also described Continental's approach to dealing with the public and the property owners as "less than honest."

In addition, the district court referred to evidence regarding the potential health hazards associated with inhalation or ingestion of carbon black, including a finding documented in Continental's Material Safety Data Sheet that carbon black is a possible cause of cancer in humans. The district court, therefore, did not clearly err when concluding that Continental's actions reflected an indifference to or a reckless disregard of the health or safety of others.[20]

We conclude that the district court's findings are supported by the record, and we agree with the district court that these facts support a finding that

[19]Although *Johansen* concerned water pollution, our rationale (i.e. Georgia's legislative enactments addressing pollution) applies equally in this case. *See* O.C.G.A. § 12-9-23 (2006) (establishing civil penalty of up to $25,000 per day for violations of the Georgia Air Quality Act, §§ 12-9-1 to 12-9-25).

[20]The evidence does not conclusively establish that carbon black is carcinogenic in humans. Continental suggests that lack of certainty renders its conduct less reprehensible. On the contrary, the risk of releasing a possible carcinogen into the environment, even when, or perhaps especially when, the possibility is not well defined, counsels for the adoption of extraordinary precautions and justifies extraordinary penalties when available precautions are consciously ignored.

Continental's actions were "so reprehensible as to warrant the imposition of further sanctions." *Campbell*, 538 U.S. at 419, 123 S. Ct. at 1521. We go further, however, to note briefly those aspects of the facts in this case that justify the punitive damages actually awarded.

With respect to the pattern and duration of Continental's intentional misconduct, the events at issue spanned more than five years, and Continental continued its course of action and inaction undeterred by both the prospect and reality of litigation. In addition, the harm inflicted cannot adequately be characterized as solely economic. Continental's actions resulted in the destruction of a once successful business and interfered with the use and enjoyment of municipal property. Moreover, according to the evidence, the City, which is accountable to all of its citizens, was compelled to approve special funding for and devote extraordinary labor resources to the cleaning of its damaged properties.

The evidence also demonstrated Continental's willingness to elude accountability. An employee of the Alabama Department of Environmental Management ("ADEM") apparently offered the Phenix City plant management advanced warning of impending, supposedly surprise, government inspections. Furthermore, the properties at issue are located in a state whose government could offer the property owners no regulatory protection. Indeed, Nicks testified that

when representatives from the Georgia Department of Natural Resources surprised him with an unannounced visit to inspect the plant, he denied them entry.

Finally, we note that Continental's actions likely harmed a great number of people and businesses who are not parties to this litigation. While punitive damages may not be awarded to punish for harm inflicted on nonparties, we may consider the risk of harm to others as part of the reprehensibility analysis. *Philip Morris U.S.A. v. Williams*, 549 U.S. _____, 127 S. Ct. 1057, 1063-64 (2007).

We conclude, therefore, that Continental's actions and inaction were exceedingly reprehensible.[21] We decline Continental's invitation to compare its actions with those of other defendants in dissimilar contexts and base our conclusion on the facts before us in this case alone. *Cf. TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 458, 113 S. Ct. 2711, 2720 (1993) (plurality) ("[W]hile we do not rule out *the possibility* that the fact that an award is significantly larger than those in *similar circumstances might*, in a given case, be one of many relevant considerations, we are not prepared to enshrine petitioner's comparative approach in a 'test' for assessing the constitutionality of punitive

---

[21] The fact that Alabama permitted CCC to release carbon black into the atmosphere is of no consequence and, in any case, does not negate the reprehensibility of Continental's actions. As Continental acknowledged at trial, its permit did not empower the company to damage property. Further, the Supreme Court has noted that "[l]awful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious." *Campbell*, 538 U.S. at 422, 123 S. Ct. at 1522.

damages awards." (emphasis added)). A substantial penalty beyond the compensatory damages awarded was fully warranted. *See In re Exxon Valdez*, 472 F.3d 600, 625 (9th Cir. 2006) (reducing punitive damages award to $2.5 billion despite actual damages, including those paid to settle numerous claims, of $504.1 million); *Bogle v. McClure*, 332 F.3d 1347, 1362 (11th Cir. 2003) (upholding a punitive damages award of $13.3 million imposed on the board of trustees for a public library system and the board's director despite a compensatory damages award exceeding $3 million when the defendants' wrongful actions were intentional and evidenced efforts to cover up their wrongful intent); *cf. Johansen*, 170 F.3d at 1339 (upholding a punitive damages award of $4.35 million, which represented nearly 100 times the compensatory award, in a pollution case involving conduct deemed "not very reprehensible, with no aggravating factors present"), *cert. denied sub nom Combustion Eng'g, Inc. v. McGill*, 528 U.S. 931, 120 S. Ct. 329 (1999).

    2.    *The Difference Between Actual or Likely Damages and the Punitive Damages Award*

We next ask "'whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred.'" *TXO Prod. Corp.*, 509 U.S. at

34

460, 113 S. Ct. at 2721 (quoting with added emphasis *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 21, 111 S. Ct. 1032, 1045 (1991)), *quoted in Gore*, 517 U.S. at 581, 116 S. Ct. at 1602. This determination has not yet been reduced to a "simple mathematical formula." *Gore,* 517 U.S. at 582, 116 S. Ct. at 1602. Instead, the Supreme Court has endorsed the view that "ratios greater than those [the Court has] previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'" *Campbell*, 538 U.S. at 425, 123 S. Ct. at 1524 (quoting *Gore*, 517 U.S. at 582, 116 S. Ct. at 1602). Conversely, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based on the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.*

Continental contends that a punitive to compensatory damage ratio of 9:1 is unconstitutional in light of the substantial compensatory award and the Supreme Court's relevant directives. We need not address this question directly, however, because the relevant ratio is actually 5:1.

In Georgia, awards of attorney fees in tort cases involving bad faith are compensatory in nature. *See* O.C.G.A. § 13-6-11 (2006 Supp.);[22] *City of Warner Robins v. Holt*, 470 S.E.2d 238, 240 (Ga. Ct. App. 1996) (holding that the purpose of an award of attorney fees and litigation expenses "is to compensate an injured party, in order that such parties are not further injured by the cost incurred as a result of the necessity of seeking legal redress for their legitimate grievances"); *Ross v. Hagler*, 433 S.E.2d 124, 127 (Ga. Ct. App. 1993) (noting that an award of attorney fees under section 13-6-11 is not punitive in nature); *Privitera v. Addison*, 378 S.E.2d 312, 317 (Ga. Ct. App. 1989) (describing fees awardable under section 13-6-11 as an element of "actual damages"). The attorney fees in this case were premised on a finding of bad faith pursuant to section 13-6-11. Consequently, we include the attorney fees as part of the measure of actual damages for the necessary comparison. *See Willow Inn, Inc. v. Pub. Svc. Mut. Ins. Co.*, 399 F.3d 224, 234-37 (3d Cir. 2005) (relying on state law to define the character of an

---

[22]When first adopted, the statute referred specifically to "bad faith in making [a] contract" and was codified in the section of the Georgia Code governing contracts. O.C.G.A. § 13-6-11 (1982). In 1984, the statute was amended to remove the language limiting its applicability to contract cases, and it has since been applied in cases involving tort claims. *See*, *e.g.*, *St. Paul Fire & Marine Ins. Co. v. Clark*, 566 S.E.2d 2, 11 (Ga. Ct. App. 2002).

36

attorney fee award and including the fee award in its calculation of actual damages).[23]

The question we must ask then is whether a punitive damages award of $17.5 million is proportionally related to the compensatory damage award of approximately $3.2 million. Under the circumstances of this case, we think it is.

We have not overlooked the Supreme Court's guidance, described by the Court as "not binding" but "instructive," *Campbell*, 538 U.S. at 425, 123 S. Ct. at 1524, that ratios in excess of 1:1 and/or 4:1 may only rarely satisfy due process requirements.[24] The facts before us, we believe, compel application of what the Court may someday unequivocally endorse as the rare exception. *See In re Exxon Valdez*, 472 F.3d at 624 (concluding that a ratio of approximately 5:1 ($2.5billion:$504 million) was constitutionally sound despite finding that the conduct at issue was neither intentional nor malicious and that previous efforts to

---

[23]The district court's reliance on the 9:1 ratio constitutes a legal determination involving the definition of compensatory damages, which we review *de novo*. Thus, we do not mean to suggest that the district court's calculations were factually clearly erroneous.

[24]*See Campbell*, 538 U.S. at 425, 123 S. Ct. at 1524 (endorsing a 1:1 ratio as the general rule when substantial compensatory damages have been awarded and noting the Court's historical view that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety"). *But see TXO Prod. Corp.*, 509 U.S. at 462, 113 S. Ct. at 2722 (upholding a punitive damages award in excess of 526 times the actual damages awarded); *Haslip*, 499 U.S. at 23, 111 S. Ct. at 1046 (upholding a punitive damages award "more than 4 times the amount of compensatory damages, . . . more than 200 times the out-of-pocket expenses of [the plaintiff], . . . and . . . much in excess of the fine that could be imposed for insurance fraud").

correct the damage mitigated reprehensibility); *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 422 F.3d 949, 962 (9th Cir. 2005) (developing, based on the relevant Supreme Court precedents, a general guideline allowing for a single-digit ratio greater than 4:1 in cases involving "significant economic damages and more egregious behavior"), *cert. denied*, 126 S. Ct. 1912 (2006). As we have already concluded, the evidence supporting the district court's finding of reprehensibility alone justifies the punitive damages award.[25]

    3.      *Comparable Civil and Criminal Penalties for Similar Conduct*

Lastly, we must consider "the available civil and criminal penalties the state provides for" Continental's misconduct to determine whether Continental had notice that it could be ordered to pay the amount awarded. *Johansen*, 170 F.3d at 1337. "[A] reviewing court engaged in determining whether an award of punitive damages is excessive should 'accord "substantial deference" to legislative judgments concerning appropriate sanctions for the conduct at issue.'" *Gore*, 517 U.S. at 583, 116 S. Ct. at 1603 (quoting *Browning-Ferris Indus. of Vt., Inc. v.*

---

[25]We reach this conclusion without considering the likely harm that would have resulted had Continental been permitted to continue polluting the property owners' property. Obviously, this factor would only strengthen our conclusion.

*Kelco Disposal, Inc.*, 492 U.S. 257, 301, 109 S. Ct. 2909, 2934 (1989) (O'Connor, J., and Stevens, J., concurring in part and dissenting in part)). This factor, however, "is accorded less weight in the reasonableness analysis than the first two guideposts." *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1364 (11th Cir. 2004).

We must first decide whether to look to the law of Georgia, which has the greater interest in deterring Continental's conduct in this case, or the law of Alabama, which has regulatory authority over Continental. We assume from the parties' arguments that Alabama law is the appropriate guide.

Relying on provisions in the Alabama Environmental Management Act ("AEMA"), Continental contends that the potential penalty in Alabama could not exceed $250,000 and therefore could not provide notice of a potential civil penalty of $17.5 million. *See* Ala. Code § 22-22A-5(18)c (2006 Repl. Vol.). While it is true that the relevant provision of the AEMA limits "the total penalty assessed in *an* order issued" (emphasis added) by the regulating agency, the statute does not limit the number of such orders the agency may issue. *Id.* In other words, ADEM is empowered to assess a penalty of up to $25,000 per violation up to a total of $250,000 per order. *Id.* That does not mean that after issuing such an order, ADEM cannot again assess penalties against a polluter who was the subject of a $250,000 fine. To so interpret the statute would lead to absurd results and defeat

39

the Act's stated intent "to improve the ability of the state to respond in an efficient, comprehensive and coordinated manner to environmental problems, and thereby assure for all citizens of the state a safe, healthful and productive environment." § 22-22A-2.[26]

Conceivably, then, Alabama could fine Continental $250,000 for every ten violations. As we stated in *Johansen*, however, "[i]f a statute provides for a range of penalties depending on the severity of the violation, . . . it cannot be presumed that the defendant had notice that the state's interest in the *specific* conduct at issue in the case is represented by the maximum fine provided by the statute." 170 F.3d at 1337. Thus, we cannot simply presume that Alabama would have fined Continental an incalculable number of times or would have assessed the maximum amount each time. Nor are we capable of guessing as to the frequency of Continental's violations, though evidence in the record indicates that it did indeed violate conditions of its permit and thus the AEMA. *See generally* § 22-22A-5(18).

We do not find ourselves utterly without guidance, however, for "the extent of the defendant's statutory notice is related to the degree of reprehensibility of his

---

[26]We do not intend to suggest that the penalties assessable pursuant to the AEMA provide the "most relevant 'other sanction.'" *Johansen*, 170 F.3d at 1337. Continental focuses solely on the AEMA, as did the district court, apparently. The property owners offer no alternative.

conduct." *Johansen*, 170 F.3d at 1337. Considering the reprehensibility of Continental's conduct, we can surmise that if Alabama citizens had found themselves the victims of Continental's malfeasance, ADEM would have vigorously enforced the relevant statutes and fined Continental closer to the maximum amount allowed, perhaps several times if necessary. Continental consequently was on notice that its actions could result in civil penalties that far exceed the per-order cap limiting ADEM's discretion, and we do not believe it implausible that vigorous enforcement would have led to an accrual of fines totaling several million dollars. We are thus satisfied that the award was not grossly disproportionate to the penalties Continental faced for its actions. Moreover, we conclude that the punitive damages award was not unconstitutionally excessive.

## V. CONCLUSION

In sum, the evidence and the relevant law supported the jury's verdict, the final judgment, and the district court's decision to deny Continental's post-trial motion. Accordingly, we affirm the district court's order and the judgment entered on the jury's verdict.

**AFFIRMED.**