[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-13045

_____

D.C. Docket No. 3:09-cv-13703-WGY-JBT

KENNETH KERRIVAN,

Plaintiff - Appellee,

versus

R.J. REYNOLDS TOBACCO COMPANY,
individually and as successor by merger to the
Brown and Williamson Tobacco Corporation
and The American Tobacco Company,
PHILIP MORRIS USA, INC.,

Defendants – Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 24, 2020)

Before WILLIAM PRYOR and JILL PRYOR, Circuit Judges, and ROBRENO,[*] District Judge.

JILL PRYOR, Circuit Judge:

In this *Engle* progeny case,[1] Philip Morris USA Inc. and R.J. Reynolds Tobacco Company (together, the "Tobacco Companies") appeal the district court's denials of their renewed motions for judgment as a matter of law and motion for a new trial or remittitur.  The motions challenged the amount of damages a jury awarded to plaintiff Kenneth Kerrivan for his intentional tort claims and the sufficiency of the evidence to prove his fraudulent concealment and conspiracy to fraudulently conceal claims.  On appeal, the Tobacco Companies argue that the district court should have granted their motions because (1) the compensatory

---

[*] Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of Pennsylvania, sitting by designation

[1] *Engle* progeny cases are cases arising from a class action against tobacco companies on behalf of Florida-resident smokers who developed smoking-related illness caused by addiction to nicotine in cigarettes.  *See Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246 (Fla. 2006).  In *Engle*, the Florida Supreme Court approved in part and vacated in part the jury's verdict finding liability, vacated the award of punitive damages, and decertified the class, instructing *Engle* class members to pursue individual actions to resolve the remaining individual issues and to recover damages.  *Id.* at 1254.  The Court instructed that certain findings would have preclusive effect in future individualized actions, including that:

> [S]moking cigarettes causes certain diseases (including lung cancer), [] nicotine is addictive, [] the tobacco companies placed cigarettes on the market that were defective and unreasonably dangerous, [] the tobacco companies were negligent, and [] the tobacco companies concealed or omitted material information about the health effects and addictive nature of cigarettes and also conspired with one another to do so.

*Philip Morris USA, Inc. v. Duignan*, 243 So. 3d 426, 430 (Fla. Dist. Ct. App. 2017) (citing *Engle*, 945 So. 2d at 1257 n.4, 1276-77).

damages award was excessive, (2) the punitive damages award was unconstitutional, and (3) Kerrivan failed to prove detrimental reliance as required for his fraud claims.[2]  With the benefit of oral argument and after careful review of the record, we affirm the district court's denial of the Tobacco Companies' motions.

## I.     BACKGROUND

### A.     Factual Background[3]

#### 1.     Kerrivan's Life as a Smoker

Kerrivan remembers seeing cigarette advertisements throughout his childhood.  Cigarette advertisements were ubiquitous, appearing on the television in his family home and in the stores where he shopped growing up.  According to Kerrivan, "[t]here was always ads someplace for cigarettes."  Doc. 93 at 78.[4]  And "[e]verybody seemed to smoke."  *Id.* at 76.  One of his earliest memories was

---

[2] The Tobacco Companies also argue that (1) "application of the *Engle* findings to establish the conduct elements of the plaintiff's claims violated their due process rights" and (2) "the claims for strict liability and negligence are preempted by federal law."  Appellant Br. at 16. They concede that our precedent forecloses these arguments and seek only to preserve them for further appellate review.  *Id.*; *see also Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1174, 1178-80 (11th Cir. 2017) (en banc).

[3] In describing the facts, we view the evidence in the light most favorable to Kerrivan and draw all reasonable inferences and credibility choices in favor of the jury's verdict.  *See Goldsmith v. Bagby Elev. Co.*, 513 F.3d 1261, 1275 (11th Cir. 2008) (explaining that when we review the denial of a motion for judgment as a matter of law, "[w]e consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party" (internal quotation marks omitted)).

[4] "Doc. #" refers to the numbered entry on the district court's docket.

seeing his father rebuke his mother about her smoking habit and imploring her to stop. He was surrounded by smokers, including family members and friends. Joining them, Kerrivan began smoking at the age of 14, and by the age of 20, he was smoking at least a pack of cigarettes every day.

Over the years, Kerrivan's smoking became pervasive. He would smoke "before [his] feet even hit the floor" in the morning, before sleeping at night, and when he awoke during the night to go to the bathroom. *Id.* at 84-86. He smoked in his car. When allowed, he smoked at work. He smoked even when smoking was not allowed, repeatedly clashing with his daughter—once when he left her wedding rather than comply with a non-smoking policy and another time when she asked him not to smoke in her home because of his grandchild's presence.

Kerrivan smoked several brands of cigarettes over the years: Lucky Strikes in his early years, then Camels for years before he settled on Marlboros of various kinds. He also tried Kool cigarettes because he thought they would be easier on his throat, but he hated their taste and threw them away.

As a Marlboro smoker, Kerrivan smoked filtered Marlboro Reds because he believed that the filtered cigarettes would "cut out the tar and nicotine" and that the Tobacco Companies made a lighter cigarette to "make [smoking] easier on [consumers]." *Id.* at 89; *see id.* at 83. He saw commercials concerning filtered cigarettes that were consistent with this view. At one point, Kerrivan began

4

smoking Marlboro Lights to try to quit smoking. Instead of helping him quit, the reduced amount of tar and nicotine made him crave cigarettes more; he increased his habit to smoking two packs a day. Another time, he tried Marlboro Ultra Lights, believing that they would make it easier for him to quit smoking. Again, the lower tar and nicotine had the opposite effect: They led Kerrivan to smoke three packs a day because he "was getting nothing out of the cigarette." *Id.* at 83.

After approximately 30 years as a smoker, in 1993 Kerrivan was diagnosed with chronic obstructive pulmonary disease ("COPD"). He then redoubled his efforts to quit. These efforts resulted in panic attacks and a prescription for Xanax to alleviate his withdrawal symptoms. Only after his doctor diagnosed him with double walking pneumonia in 2006—and warned that he would die in six months if his smoking continued—did Kerrivan finally succeed in putting smoking behind him.

Twenty years have passed since Kerrivan first was diagnosed with COPD. His life has changed substantially since his diagnosis. He currently suffers from "severe[,] end-stage" COPD. Doc. 78 at 230. COPD forced him to transition from his active job as a tow truck driver to a desk job as a dispatcher. Now, his poor health prevents him from working at all, even though he would prefer to work. He can no longer build race cars as he did before his illness. He cannot do anything without using his oxygen tank. Basic activities such as showering exhaust him.

5

When he sleeps, he struggles to breathe due to his oxygen tank's tubing sometimes slipping from his nose.  Believing, based on his doctor's advice, that another bout of pneumonia would kill him, Kerrivan keeps himself away from other people.  Even so, he lives his life constantly in and out of the emergency room.

Kerrivan described quitting smoking as "the hardest thing [he] ever had to do in [his] life."  Doc. 93 at 96.  If he had known how harmful cigarettes were and how hard it would be to quit smoking, he never would have started smoking. He never thought that the Tobacco Companies would sell him a product that could cause harm to the extent he has suffered.

### 2.     Conspiracy to Conceal Effects of Nicotine Cigarettes

The evidence presented at the jury trial on Kerrivan's claims showed that the tobacco industry, including the Tobacco Companies here, conspired to conceal and misrepresent information about the addictiveness of nicotine and the serious health risks caused by smoking cigarettes.  Industry members agreed to attack the sources of health warnings and to cast doubt on the connection between smoking and disease.  At the same time, the tobacco industry pretended to be on a crusade to confirm the safety of its products, promising the American public that it would report the discovery of anything harmful.  The industry's intent was not just to hide the truth but to create enough doubt about the adverse health effects of smoking to give addicted smokers an excuse to keep smoking.

6

The industry's efforts also included design features, such as added filters, that undermined a smoker's ability to quit smoking. The Tobacco Companies began marketing filtered cigarettes to the public as a safer alternative, concealing the fact that smokers of filtered cigarettes actually ingested more tar and other carcinogens than those who smoked unfiltered cigarettes. They also hid that the design of filtered cigarettes purposefully increased the dose of nicotine, which increased the addictiveness of the cigarettes, in turn increasing sales. Further, despite knowing for decades that smoking nicotine cigarettes was addictive and caused serious diseases such as COPD, cigarette manufacturers, including the Tobacco Companies, never publicly admitted these facts until the late 1990s, well after Kerrivan was diagnosed with COPD.

## B.    Procedural Background

In 1994, Florida smokers and their survivors filed a class action against cigarette companies that included the Tobacco Companies. *See Liggett Grp. Inc. v. Engle*, 853 So. 2d 434, 440-41 (Fla. Dist. Ct. App. 2003); *R.J. Reynolds Tobacco Co. v. Engle*, 672 So. 2d 39, 40 (Fla. Dist. Ct. App. 1996). After a year-long trial on issues of liability and entitlement to punitive damages for the class as a whole, a jury found that each company had breached its duty of care and sold defective cigarettes. *See Engle*, 853 So. 2d at 441. The Florida Supreme Court upheld the jury verdicts of negligence and strict liability but decertified the class to allow

individual actions to determine remaining issues of specific causation, damages, and comparative fault. *See generally Engle v. Liggett Grp. Inc*., 945 So. 2d 1246 (Fla. 2006).

After the Florida Supreme Court's decision, members of the *Engle* class filed thousands of individual actions in state and federal courts. In *Philip Morris USA, Inc. v. Douglas*, 110 So. 3d 419, 427-28 (Fla. 2013), the Court clarified that the *Engle* jury's findings of negligence and strict liability had preclusive effect in these individual actions. We held in *Graham v. R.J. Reynolds Tobacco Co.* that "the Florida Supreme Court in *Douglas* decided a matter of state law when it explained the preclusive effect of the *Engle* jury's . . .findings." 857 F.3d 1169, 1185 (11th Cir. 2017) (en banc). And because "[w]e are bound by the decisions of state supreme courts on matters of state law when we exercise diversity jurisdiction, subject to the constraints of due process," we agreed that individual actions could proceed consistent with *Douglas*. *Id*. at 1185-86. We also rejected the cigarette companies' arguments that giving preclusive effect to the *Engle* findings violated due process and that federal preemption barred courts from affording preclusive effect to the *Engle* findings of negligence and strict liability under state law. *See id*. at 1181-91.

In this individual action, Kerrivan alleged that he was an *Engle* class member who developed COPD from his addiction to nicotine in cigarettes. He

8

asserted against the Tobacco Companies claims of strict liability, fraudulent concealment, conspiracy to fraudulently conceal, and negligence.  The district court tried Kerrivan's case in two phases:  In Phase I, the jury considered the issues of *Engle* class membership, liability, comparative fault, compensatory damages, and whether punitive damages were warranted; in Phase II, the jury determined the amount of punitive damages.

Phase I spanned nine days.  In closing argument, Kerrivan's counsel suggested to the jury that $10 million in compensatory damages might be appropriate but noted that the jury could go higher or lower than that amount. Counsel for the Tobacco Companies criticized this amount as arbitrary but suggested no alternative figure.  The jury found in Kerrivan's favor on all counts and awarded him $15.8 million in compensatory damages.  On comparative fault, the jury found Kerrivan 19% at fault, Philip Morris 50% at fault, and R.J. Reynolds 31% at fault.  The jury also decided that the Tobacco Companies' conduct warranted punitive damages.  After a one-day trial on Phase II, the jury awarded $25.3 million in punitive damages—$15.7 million against Philip Morris and $9.6 million against R.J. Reynolds.

The Tobacco Companies filed three renewed motions for judgment as a matter of law and a motion for a new trial or remittitur, arguing that:  the jury's compensatory damages award was excessive, its punitive damages award was

9

unconstitutional, and Kerrivan's fraudulent concealment and conspiracy claims should not have been submitted to the jury due to a lack of evidence of reliance. The district court denied each of the motions. The court determined that the jury's compensatory damages award bore "a reasonable relation to the injury suffered" and was within a reasonable range based on comparable cases. Doc. 174 at 7. Further, the court found no indication that the jury made its award based on passion or prejudice or that it ignored facts or misconceived the merits of the case. The district court also concluded that the punitive damages award was not unconstitutionally excessive and that the evidence presented at trial supported the jury's verdict on the fraudulent concealment and conspiracy claims. This appeal followed.[5]

## II.    STANDARDS OF REVIEW

We review the denial of a motion for a new trial or remittitur under an abuse of discretion standard. *See Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1309 (11th Cir. 2007). We likewise review for an abuse of discretion the

---

[5] Kerrivan filed a cross-appeal raising a single issue: whether, if we vacated the jury's fraudulent concealment and conspiracy findings and its punitive damages award, he would be entitled on remand to a retrial limited to the entitlement to and award of punitive damages. The Tobacco Companies conceded that Kerrivan would be so entitled under *Soffer v. R.J. Reynolds Tobacco Co.*, 187 So. 3d 1219, 1225 (Fla. 2016). We therefore dismissed Kerrivan's cross-appeal.

district court's decision to sustain a compensatory damages award. *Bogle v. McClure*, 332 F.3d 1347, 1359 (11th Cir. 2003).

We review *de novo* the constitutionality of a punitive damages award, deferring to the district court's findings of fact unless clearly erroneous. *See Action Marine*, 481 F.3d at 1309. *De novo* review also applies to the denial of a motion for judgment as a matter of law. *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1275 (11th Cir. 2008).

## III.    DISCUSSION

This appeal presents three issues:  (1) whether the compensatory damages award was excessive, (2) whether the punitive damages award was constitutional, and (3) whether the district court erred by allowing Kerrivan's fraud-based claims to go to the jury.

### A.    The Compensatory Damages Award Was Not Excessive.

Under Florida law,[6] "in every case for money damages the trial court has [an] obligation to determine if the damages award is 'excessive or inadequate in light of the facts and circumstances which were presented to the trier of fact.'" *Odom v. R.J. Reynolds Tobacco Co.*, 254 So. 3d 268, 276 (Fla. 2018)

---

[6] In reviewing a compensatory damages award on a state law claim, we evaluate the propriety of the award under state law. *See Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1212 (11th Cir. 2010); *see also Johnson v. Barnes & Noble Booksellers, Inc.*, 437 F.3d 1112, 1117 (11th Cir. 2006) (looking to Florida law to determine whether a compensatory damages award was excessive).

(quoting Fla. Stat. § 768.74(1)).  In imposing this requirement, the Florida legislature noted that although juries are a fundamental precept of American jurisprudence, requiring a court to review the damages award "provides an additional element of soundness and logic to our judicial system and is in the best interests of the citizens of this state."  Fla. Stat. § 768.74(6).  Florida law requires that when a court "finds that the amount awarded is excessive . . . it shall order a remittitur."  *Id.* § 768.74(2).

In determining whether an award is excessive or inadequate in light of the facts and circumstances presented to the trier of fact, the court shall consider the following criteria:

> (a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact;
>
> (b) Whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable;
>
> (c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture;
>
> (d) Whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered; and
>
> (e) Whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.

*Id.* § 768.74(5).  Applying these criteria, we conclude that the district court did not abuse its discretion in upholding the jury's award of compensatory damages.

12

The evidence presented at trial demonstrated that Kerrivan has suffered from COPD every day since 1993. Every aspect of his life has been affected by his disease—even breathing is a constant struggle, and he lives tethered to an oxygen tank. When he sleeps, his oxygen tank slips from his nose, and "it feels like somebody has got a bag of cement on [his] chest." Doc. 93 at 100. It takes him two hours to get dressed in the morning and about an hour and a half to shower because his oxygen levels drop from the mild exertion. He cannot work or engage in activities he used to enjoy. The prospect of death from complications related to his disease haunts his every moment and causes him to stay away from other people. Given this evidence, all of the statutory criteria weigh in Kerrivan's favor.

The first question in § 786.74(5) asks whether the compensatory damages award evinces improper influences on the jury. We find no indication in this record that the compensatory damages award was the result of passion, prejudice, or corruption. Rather, the compensatory damages award reflected the jury's consideration of the evidence presented at trial; the jury's award is consistent with this evidence. Given this consistency—and absent anything in the record showing that the jury was improperly influenced—the answer to the first question is no.

The second statutory question asks whether the jury ignored evidence or misconceived the merits of the case. The compensatory damages award was appropriate given the compelling evidence presented at trial about Kerrivan's

13

injuries. That the jury chose to accept Kerrivan's evidence and reject the Tobacco Companies' evidence does not mean that the verdict lacked a reasonable basis or that the jury ignored evidence or misconceived the merits of the case. Like the first question, we answer the second question "no."

The third question in § 786.74(5) asks whether improper elements were considered or the verdict was based on speculation or conjecture, and the fourth question asks whether the award is reasonably related to the damages suffered. Nothing in the record or about the award itself suggests that the jury considered improper elements in reaching its verdict or that the verdict was based on conjecture. The jury was presented with evidence of Kerrivan's medical issues as well as concrete, personal testimony about how his injuries impacted his life. On this record, we cannot say that the compensatory damages award bore no reasonable relationship to the injuries he suffers. The third and fourth statutory criteria also weigh in Kerrivan's favor.

The fifth and final inquiry is whether the award is supported by evidence and can be logically adduced by reasonable people. Our resolution of the previous questions answers this one: a reasonable jury could return this award.

In applying § 786.74(5) to the compensatory damages award in this case, we bear in mind that we must defer to the jury as the finders of fact whose role it is to weigh the evidence, evaluate the witnesses' credibility, and determine the

14

appropriate amount of damages.  *See Lassitter v. Int'l Union of Operating Eng'rs*, 349 So. 2d 622, 627 (Fla. 1976) ("Two factors unite to favor a very restricted review of an order denying a motion for new trial on ground of excessive verdict. . . .  The second factor is the deference properly given to the jury's determination of such matters of fact as the weight of the evidence and the quantum of damages.").  Given this deference and our conclusions that all the statutory criteria for evaluating excessiveness weigh in Kerrivan's favor, the district court did not abuse its discretion in upholding the jury's award of compensatory damages.

The Tobacco Companies' arguments address only the first question, whether the jury's award indicated passion or prejudice.  They argue that there are three indicators of passion or prejudice present in the compensatory damages award: that the verdict is (1) significantly higher than the amounts affirmed in similar cases, (2) significantly higher than the amount requested by counsel in closing argument, and (3) not supported by the evidence.  These arguments lack merit.

Turning to the Tobacco Companies' first argument, we acknowledge that reviewing "amounts awarded in similar cases has at least a limited value" in determining whether an award is excessive.  *Loftin v. Wilson*, 67 So. 2d 185, 189 (Fla. 1953).  But as the Florida Supreme Court has warned, these comparisons are "sometimes fraught with danger because, of course, each case is different and must

of necessity be measured in the light of the circumstances peculiar to it." *Id.*; *see also Laskey v. Smith*, 239 So. 2d 13, 14 (Fla. 1970) ("In its movement toward constancy of principle, the law must permit a reasonable latitude for inconstancy of result in the performance of juries.").

Without a doubt, the compensatory damages award in this case is higher than the awards in other *Engle* progeny cases, but this fact alone does not establish that the jury was swayed by passion or prejudice.[7]  "The fact that a damage award is large does not in itself render it excessive nor does it indicate that the jury was motivated by improper consideration in arriving at the award." *Allred v. Chittenden Pool Supply, Inc*., 298 So. 2d 361, 365 (Fla. 1974).  A verdict should only be disturbed when "it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." *Bould v. Touchette*, 349 So. 2d 1181, 1184-85 (Fla. 1977).  A review of compensatory damages awards in other *Engle* progeny cases demonstrates that the verdict in this case should not be disturbed because it is not outside "the maximum limit of a reasonable range" for such cases.  *Id.*; *see, e.g.*, *R.J. Reynolds Tobacco*

---

[7] The Tobacco Companies contend that we should consider only *Engle* progeny with a living plaintiff that have been affirmed upon appellate review.  We disagree.  The Tobacco Companies have offered no authority—binding or persuasive—to support this notion.  So, we reject this limiting factor in comparing *Engle*-progeny verdicts.  And even if we considered only the decisions the Tobacco Companies rely on, we still could not infer from the fact that other juries have awarded less damages to living plaintiffs that the award here was excessive.

16

*Co. v. Monroe*, 212 So. 3d 545 (Fla. Dist. Ct. App. 2017) (affirming $11 million compensatory damages award); *Philip Morris USA, Inc. v. Cuculino*, 165 So. 3d 36, 39-40 (Fla. Dist. Ct. App. 2015) (affirming $12.5 million compensatory damages award); *Philip Morris USA, Inc. v. Lukacs*, 34 So. 3d 56 (Fla. Dist. Ct. App. 2010) (affirming $24.8 million compensatory damages award); *see also Schoeff v. R.J. Reynolds*, 232 So. 3d 294, 299-300, 309 (Fla. 2017) (overturning district court of appeals' remittitur of compensatory damages award and its ruling that punitive damages award was unconstitutionally excessive; upholding award of $10.5 million in compensatory damages and $30 million in punitive damages).

While the $15.8 million compensatory damages award is larger than the awards in some other *Engle* progeny cases, the award does not "obviously [] exceed" the "reasonable range within which the jury may properly operate." *Bould*, 349 So. 2d at 1185.  We are persuaded from our review of the record that the facts of this case are "simply different" from cases with lower awards, and these differences sufficiently account for the higher award.  *See Odom v. R.J. Reynolds Tobacco Co.*, 254 So. 3d 268, 280 (Fla. 2018) (internal quotation marks omitted); *Loftin*, 67 So. 2d at 189 ("[E]ach case is different and must of necessity be measured in the light of the circumstances peculiar to it.").

As to the Tobacco Companies' second argument, Florida courts have specifically recognized that a jury can "award damages equal to or in excess of

17

those requested by counsel in closing argument." *Lopez v. Cohen*, 406 So. 2d 1253, 1256 (Fla. Dist. Ct. App. 1981). In *Schoeff*, the Florida Supreme Court held that an award was not "unreasonable or excessive" merely because the amount is more than what counsel requested. 232 So. 3d at 308. Moreover, Florida courts have affirmed awards in excess of the plaintiffs' counsel's request in other *Engle* progeny cases. *See, e.g.*, *Cuculino*, 165 So. 3d at 39 (affirming $12.5 million compensatory damages award even though counsel requested only $10 million in closing argument).

Consistent with the notion that a jury can "award damages equal to or in excess of those requested by counsel," *Lopez*, 406 So. 2d at 1256, Kerrivan's counsel gave the jury a $10 million benchmark while reminding them that they could go higher or lower than that amount. *See* Doc. 106 at 60-61. By contrast, the Tobacco Companies' counsel offered no alternative amount or range, and "[i]t is difficult for a party to challenge an award as excessive after the fact when that party declined to offer any guidance to the jury at trial." *Odom*, 254 So. 3d at 280. That the jury chose, in its discretion, to exceed the benchmark offered does not justify remittitur of the compensatory damages award or compel a new trial.

The Tobacco Companies' third argument likewise fails. They argue that comparison to injuries in other, arguably more serious, COPD cases in which juries awarded lower compensatory damages demonstrates a lack of "logical nexus" in

18

this case. Appellant's Br. at 28. But again, the Florida courts have warned against the relative weighing of injuries. *See Loftin*, 67 So. 2d at 189 ("[E]ach case is different and must of necessity be measured in the light of the circumstances peculiar to it."). Juries are not required to exercise their judgment consistent with other juries in other cases. The evidence presented in this case supports the compensatory damages award. That other juries in other cases with different evidence of injury chose to award lower amounts does not justify overturning the award in this case. *See Odom*, 254 So. 3d at 277 ("Jurors know the nature of pain, embarrassment and inconvenience, and they also know the nature of money. Their problem of equating the two to afford reasonable and just compensation calls for a high order of human judgment . . . . Their problem is not one of mathematical calculation but involves an exercise of their sound judgment of what is fair and right." (quoting *Braddock v. Seaboard Air Line R.R. Co.*, 80 So.2d 662, 668 (Fla. 1955))).

In sum, the Tobacco Companies failed to demonstrate that the compensatory damages award was excessive under Florida law. They therefore failed to establish that the district court abused its discretion by denying their motion for a new trial or remittitur.

19

**B.**    **The Punitive Damages Award Is Not Unconstitutionally Excessive.**

The Tobacco Companies contend that the punitive damages award was unconstitutionally excessive because it is disproportionate to the harm Kerrivan suffered.  We disagree.[8]

"Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996).  "Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition," and states "have considerable flexibility in determining the level of punitive damages that they will allow."  *Id.* at 568.  But an award runs afoul of the Due Process Clause when it "can fairly be categorized as grossly excessive in relation to these interests."  *Id.* (internal quotations omitted).

To help determine when an award is grossly excessive, the Supreme Court has adopted three guideposts:  "the degree of reprehensibility" of the defendant's

---

[8] The Tobacco Companies also argue that substantial punitive damages are unnecessary to punish the defendants or to deter future misconduct and, to the extent any punitive award is necessary, the damages should be low enough that the aggregate punishment across all *Engle* progeny cases should not be excessive.  Both arguments are irrelevant to the constitutional test for excessiveness.  Further, the Tobacco Companies provide no authority to support this view of punitive awards.  These arguments thus cannot justify reversal of the punitive damages award on constitutional grounds.  This is not to say, and we do not address here, whether under certain circumstances, multiple awards of punitive damages for the same conduct could not produce an aggregate amount that would be excessive and conceivably violate due process.

actions; "the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Id.* at 574-75; *see also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).

### 1. Degree of Reprehensibility

"'The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.'" *State Farm*, 538 U.S. at 419 (alteration adopted) (quoting *Gore*, 517 U.S. at 575). We determine the reprehensibility of a defendant by considering whether:

(1)    the harm caused was physical as opposed to economic;

(2)    the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others;

(3)    the target of the conduct had financial vulnerability;

(4)    the conduct involved repeated actions or was an isolated incident; and

(5)    the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.* Here, four of these factors weigh against the Tobacco Companies.

As to the first factor, Kerrivan's COPD is a physical injury, causing Kerrivan's overall deteriorating health and resulting in a terminal condition. This factor weighs in his favor.

21

On the second factor, the evidence established the Tobacco Companies' indifference and reckless disregard for the health and safety of smokers like Kerrivan. The Tobacco Companies knew that cigarettes containing nicotine were addictive and caused serious health conditions. Instead of admitting these facts, they concealed and openly denied them. Further, they coordinated attacks on the source of health warnings, intentionally casting doubt on the connection between cigarettes and detriment to health. These actions demonstrate a high level of indifference and reckless disregard for the health and safety of smokers, including Kerrivan. Thus, this factor weighs in Kerrivan's favor.

The fourth factor[9] looks at whether the Tobacco Companies' conduct was repeated and not an isolated incident. The Tobacco Companies repeatedly denied the harmful health effects of cigarettes despite possessing knowledge of these effects decades before acknowledging them. Accordingly, this factor also weighs in Kerrivan's favor.

Regarding the fifth factor, the evidence demonstrated that the Tobacco Companies' conduct was intentional. The Tobacco Companies knew that cigarettes were addictive and linked to serious health conditions. Despite this knowledge, they not only concealed and denied the adverse health effects of

---

[9] The district court concluded that the third factor did not weigh in Kerrivan's favor because "[t]here was no evidence that Kerrivan was financially vulnerable." Doc. 174 at 10. Because neither party challenges it, we accept the district court's analysis of this factor.

smoking, but they also deliberately designed their product to deliver higher doses of nicotine to smokers, all the while making cigarettes milder and more inhalable, and therefore more addictive. They developed "filtered" and "light" products to deceive smokers into believing these products were safer. This factor, too, weighs in Kerrivan's favor.

In short, four of the five factors for evaluating reprehensibility weigh against the Tobacco Companies. *See Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1219 (11th Cir. 2010) ("While there is no requirement that a certain number of the five *State Farm* factors be present in order to support a finding of reprehensibility, reprehensibility grows more likely as more factors are present."). The Tobacco Companies' conduct was particularly reprehensible; the first—and most important—guidepost weighs heavily in Kerrivan's favor.

### 2.    Disparity Between Harm and Award

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Gore*, 517 U.S. at 580. For this second guidepost, a "comparison between the compensatory award and the punitive award is significant." *Id.* at 581. Courts often employ a ratio of punitive to compensatory damages to test the reasonableness of the punitive damages award. *See State Farm*, 538 U.S. at 425.

23

The Tobacco Companies argue that the ratio of punitive damages to compensatory damages confirms the excessiveness of the punitive damages award.

Here, the punitive damages award was $25.3 million, and the compensatory damages award was $15.8 million, making the ratio of punitive damages to compensatory damages approximately 1.6:1.  This ratio is significantly lower than ratios that courts have accepted as satisfying due process.  *See, e.g.*, *Bogle v. McClure*, 332 F.3d 1347, 1361-62 (11th Cir. 2003) (noting that punitive to compensatory ratio "in the neighborhood of 4:1" does not violate due process); *R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060, 1072 (Fla. Dist. Ct. App. 2010) (concluding that punitive to compensatory ratio of 7.58:1 did not "offend due process").  So, we cannot say that the 1.6:1 ratio established that the punitive damages award was excessive.

The Tobacco Companies argue that the 1.6:1 ratio is not the correct ratio to consider due to the jury's apportionment of fault.  The appropriate ratios are closer to 2:1 for both companies, they contend, because we should look only to the amount of compensatory and punitive damages awarded against each defendant.  But even assuming the Tobacco Companies are correct that these are the relevant ratios, the punitive damages award still would not be unreasonable.  The Supreme Court has explained that there are "no rigid benchmarks that a punitive damages award may not surpass," but "[s]ingle-digit multipliers are more likely to comport

24

with due process, while still achieving the State's goals of deterrence and retribution." *State Farm*, 538 U.S. at 425; *see Gore*, 517 U.S. at 580-81 (discussing history of courts awarding double, treble, or quadruple damages). The multipliers here are in the low single digits. We have upheld considerably larger ratios of punitive to compensatory damages. *See McGinnis v. Am. Home Mortg. Servicing, Inc.*, 901 F.3d 1282, 1290 (11th Cir. 2018) (discussing decisions in which we upheld punitive damages awards with ratios of 5.5:1, 9.2:1, and 4:1). For these reasons, the second guidepost also weighs in Kerrivan's favor.

3. **Difference Between Damages and Civil Penalties Authorized or Imposed in Comparable Cases**

The final guidepost considers "the available civil and criminal penalties the state provides for" the Tobacco Companies' misconduct to determine whether they had notice that they could be ordered to pay the amount awarded. *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1337 (11th Cir. 1999). "[A] reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *Gore*, 517 U.S. at 583 (internal quotation marks omitted). This factor, however, "is accorded less weight in the reasonableness analysis than the first two guideposts." *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1364 (11th Cir. 2004).

25

The Tobacco Companies ask us to compare the awards of punitive damages to the civil penalties authorized for willful violations of Florida's Deceptive and Unfair Trade Practices Act. *See* Fla. Stat. § 501.2075. They observe that the Act authorizes a maximum penalty of $10,000 for each willful violation, *id.*, far less than the punitive damages awarded here. But the Tobacco Companies fail to recognize that violators of the Act are subject to a maximum $10,000 penalty "for *each* [willful] violation." *Id.* (emphasis added). So, the relevant comparison would be the total penalties authorized for each of the willful violations the Tobacco Companies committed over Kerrivan's nearly five decades as a smoker that contributed to his harm. But even assuming that this guidepost favors the Tobacco Companies, it does not, in the light of the first two guideposts, compel the conclusion that the punitive damages awarded here were unconstitutionally excessive.

Because the *Gore* guideposts weigh in Kerrivan's favor, we conclude that the punitive damages award is not unconstitutionally excessive. The district court correctly denied the Tobacco Companies' motion for judgment as a matter of law on the constitutionality of the punitive damages award.

## C.    The District Court Did Not Err by Submitting Kerrivan's Fraud Claims to the Jury.

The Tobacco Companies argue that the district court should not have allowed Kerrivan's fraud-based claims to go to the jury because the evidence was

26

insufficient for a reasonable jury to find that Kerrivan detrimentally relied on their concealment of material information about the risks of smoking. We find, to the contrary, that the evidence supported an inference of detrimental reliance by Kerrivan. The district court correctly denied the Tobacco Companies' renewed motion for judgment as a matter of law.

*Engle* progeny plaintiffs need not demonstrate that they relied on specific statements from cigarette companies to establish detrimental reliance for fraud-based claims under Florida law. *See, e.g.*, *Philip Morris USA Inc. v. McCall*, 234 So. 3d 4, 14 (Fla. Dist. Ct. App. 2017) (explaining that in an *Engle* case a fraudulent concealment claim need not be limited to reliance on a particular statement); *Philip Morris USA, Inc. v. Duignan*, 243 So. 3d 426, 439 (Fla. Dist. Ct. App. 2017) (holding that an *Engle* progeny plaintiff was not required to prove detrimental reliance on a specific statement). "Florida law permits an *Engle*-progeny jury to infer reliance based on evidence that the plaintiff was exposed to the disinformation campaign and harbored a misapprehension about the health effects and/or addictive nature of smoking." *Cote v. R.J Reynolds Tobacco Co.* 909 F.3d 1094, 1108 (11th Cir. 2018) (collecting cases). To decide whether the evidence was sufficient to raise an inference of detrimental reliance, we must determine "[w]hether, considering all evidence and drawing all reasonable inferences in favor of [Kerrivan], any reasonable juror could have inferred that [he]

27

was exposed to [the Tobacco Companies'] decades-long, pervasive disinformation campaign and was accordingly confused regarding the health effects or addictive nature of smoking cigarettes such that [he] may have behaved differently had [he] known the true facts." *Id.*

The jurors in this case heard evidence about the tobacco industry's sustained and pervasive disinformation campaign. Kerrivan also testified about his exposure to cigarette advertisements and that the advertisements influenced his decisions about which cigarettes to smoke, such as his decision to switch to filtered cigarettes to "cut out the tar and nicotine," Doc. 93 at 89—the very claim the tobacco industry made in marketing filtered cigarettes. Further, Kerrivan testified that he switched to Marlboro Lights in an attempt to quit smoking but instead ended up smoking more packs of cigarettes per day, the exact outcome the tobacco industry sought in making lighter cigarettes. He also testified that, had he known had bad cigarettes were for him or how addictive they were, he never would have started smoking and probably would have quit sooner. This evidence is sufficient to sustain an inference of detrimental reliance.

The Tobacco Companies contend that, because Kerrivan introduced no evidence that he heard or saw any particular advertisement that misled him, the Florida First District Court of Appeals' decision in *R.J. Reynolds Tobacco Co. v. Whitmire*, 260 So. 3d 536 (Fla. Dist. Ct. App. 2018), forecloses recovery on his

fraud claims.  This argument flies in the face of our previous observation that

"Florida courts have consistently held that *Engle*-progeny plaintiffs are not

required to show reliance on a specific statement."  *Cote*, 909 F.3d at 1108.

In *Cote*, we explained that the "unique circumstances underlying *Engle*-

progeny fraudulent concealment claims" has caused the Florida courts to "permit[]

an *Engle*-progeny jury to infer reliance based on evidence that the plaintiff was

exposed to the disinformation campaign and harbored a misapprehension about the

health effects and/or addictive nature of smoking."  *Id.* (collecting cases).  The

Tobacco Companies maintain that *Whitmire*, which was decided after *Cote*,

changed Florida law such that "the *only* proof that will satisfy the detrimental

reliance requirement is evidence that the smoker read, saw, or heard a misleading

statement."  Reply Br. at 20.  We are not persuaded.

Generally, we are bound by a previous decision of this court interpreting

state law unless it is overruled by the court sitting en banc or "subsequent decisions

of the United States Supreme Court or the Florida courts cast doubt on our

interpretation of state law."  *Hattaway v. McMillian*, 903 F.2d 1440, 1445 n.5 (11th

Cir. 1990).  We reject the Tobacco Companies' argument because *Whitmire* casts

no doubt on *Cote*'s interpretation of Florida law.  *Whitmire* merely explained that a

jury may draw an inference of reliance on misleading advertisements only if the

plaintiff "connect[s] [his] smoking to the false information disseminated by the

tobacco companies." *See* 260 So. 3d at 540.  The appellee in *Whitmire* was the husband of the decedent smoker.  *Id.* at 537.  At trial, he provided no evidence that connected his wife's smoking to the false information disseminated by the tobacco industry.  *Id.* at 539.  Instead, the evidence presented at trial displayed a lack of interest in cigarette advertisements:

> Appellee testified that he did not know whether the decedent was influenced by cigarette advertisements and that they had never discussed any statements by tobacco companies; Appellee's son testified that he could not recall the decedent ever expressing interest in a statement from a tobacco company; and Appellee's sister-in-law testified that she had never heard the decedent mention a cigarette advertisement.  While Appellee testified that he was "sure" the decedent saw cigarette advertisements on television, he also testified that he did not know if she saw any "statements" from any tobacco companies.

*Id.* at 539-40.  Because no evidence connected the decedent's smoking to any false information distributed by the tobacco industry, the court in *Whitmire* concluded that the appellee "failed to present adequate evidence as a matter of law that the decedent relied on fraudulent statements."  *Id.* at 541.  This decision did not change Florida law concerning the circumstances in which a jury can infer reliance in *Engle* progeny cases.  The requirements remain the same:  that the plaintiff was exposed to the disinformation campaign and harbored a misapprehension about the health effects and/or addictive nature of smoking.

Kerrivan satisfied this requirement: not only did he present evidence that he was exposed throughout his life to the Tobacco Companies' large-scale advertising

campaign, but he also testified that his decisions were influenced by the campaign's contents. From this evidence, a reasonable jury could infer that Kerrivan would have quit smoking earlier had he known the true facts about the health risks of the cigarettes that he smoked.[10]

Therefore, the district court did not err in submitting Kerrivan's fraud claims to the jury. For the same reasons, it properly denied the Tobacco Companies' renewed motion for judgment as a matter of law.

## IV.    CONCLUSION

For the reasons set forth above, we affirm the district court's denials of the Tobacco Companies' motions for judgment as a matter of law and for a new trial or remittitur.

**AFFIRMED.**

---

[10] The Tobacco Companies also argue that Kerrivan could not have detrimentally relied on their misinformation because he had knowledge of the dangers of smoking from having observed his mother's smoking and his father's imploring her to quit. Even if Kerrivan's mother's smoking made him generally aware of the health risks of smoking, his testimony demonstrated that he did not fully comprehend all the dangers of smoking; for example, that filtered and light cigarettes would further his addition rather than helping him to quit. *See Philip Morris USA, Inc. v. Naugle*, 103 So. 3d 944, 947 (Fla. Dist. Ct. App. 2012) (affirming finding of reliance where the smoker "was aware that smoking could have been dangerous to her health").